## IN THE CIRCUIT COURT FOR
## ANNE ARUNDEL COUNTY, MARYLAND

ANNE ARUNDEL COUNTY,
MARYLAND,
A Body Corporate and Politic
2660 Riva Road – 4th Floor
Annapolis, MD  21401

                          Plaintiff,

       vs.

EXPRESS SCRIPTS, INC.,
One Express Way
St. Louis, MO 63121

EXPRESS SCRIPTS
ADMINISTRATORS, LLC,
One Express Way
St. Louis, MO 63121

MEDCO HEALTH SOLUTIONS, INC.,
One Express Way
St. Louis, MO 63121

ESI MAIL PHARMACY SERVICE, INC.
One Express Way
St. Louis, MO  63121

EXPRESS SCRIPTS PHARMACY, INC.,
One Express Way
St. Louis, MO 63121

OPTUMRX, INC.,
2300 Main St.
Irvine, CA 92614

OPTUMINSIGHT, INC.,
11000 Optum Cir.
Eden Prairie, MN 55344

OPTUMINSIGHT LIFE SCIENCES,
INC.,
1325 Boylston St.
Boston, MA 02215

Civil Action No.: C-02-CV-23-002398

**Complaint
(REDACTED)**

**Jury Trial Requested**

CVS HEALTH CORPORATION
One CVS Drive
Woonsocket, RI  02895

CAREMARK RX, L.L.C.
One CVS Drive
Woonsocket, RI  02895

CAREMARKPCS HEALTH, L.L.C.
One CVS Drive
Woonsocket, RI  02895

CAREMARK, L.L.C.
2211 Sanders Road
Northbrook, IL  60062

Defendants.

**PRELIMINARY STATEMENT**

1.      Plaintiff Anne Arundel County, Maryland ("County"), brings this action against Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc. (referred to collectively herein as "Express Scripts," "ESI," or "Express Scripts Defendants"), OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc. (referred to collectively herein as "OptumRx," "Optum," or "Optum Defendants"), and CVS Health Corporation, Caremark Rx, L.L.C., CaremarkPCS Health L.L.C., and Caremark, L.L.C. (referred to collectively herein as "CVS Caremark" or "CVS Caremark Defendants") (Express Scripts Defendants, Optum Defendants, and CVS Caremark Defendants are collectively referred to herein as "Defendants")  in order to abate the public nuisance caused in substantial part by Defendants' unreasonable acts and omissions fueling the opioid epidemic.  Defendants collaborated with opioid manufacturers, partnering with them in the deceptive, dangerous marketing of these all too often lethal drugs and, in exchange for rebates and other payments from opioid manufacturers, placed opioids on formularies with preferred status and with little to no limits on their approval for use.  In addition, instead of reporting illegitimate prescribing and sales uniquely visible to them in the extensive data they collect, the Defendants ignored evidence of misuse, addiction, and diversion and used their data to boost their profits and manufacturers' sales at the expense of public health and safety.  In support of its claims, the County states as follows:

2.      This case arises from the worst human-made epidemic in modern medical history – an epidemic of addiction, overdose and death caused by an oversupply of opioids flooding communities from powerful corporations who sought to profit at the expense of the public.

3.      By now, most Americans have been affected, either directly or indirectly, by the opioid disaster. Due in substantial part to the wrongful conduct of the largest pharmacy benefit

managers (PBMs) in the nation, described further below, between 1999 and 2010, the amount of prescription opioids sold annually in the U.S. quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S. - enough to medicate every adult in America around the clock for a month. Since the push to expand prescription opioid use began in the late 1990s, the death toll has steadily climbed, with no sign of slowing. The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths. According to the data, there were an estimated 107,622 drug overdose deaths in the United States during 2021. That is nearly a 15% increase from the estimated deaths in 2020.[1]

4.    From 1996 through 2019, nearly 500,000 people died from an overdose involving any opioids.[2] The prescription opioids involved in these deaths include brand-name prescription medications like OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram, as well as generics like oxycodone, hydrocodone, tramadol, and fentanyl.

5.    Many of the overdoses from non-prescription opioids are also directly related to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin. According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin.[3] In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC has identified addiction to prescription pain medication as the strongest risk

---

[1] https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.

[2] https://www.cdc.gov/opioids/data/analysis-resources.html;
https://pubmed.ncbi.nlm.nih.gov/35105535/#:~:text=The%20US%20opioid%20crisis%20came,people%20from%20
1996%20to%202019.

[3] *See also* UnitedHealth Group, *Addressing the Opioid* Crisis,
https://www.unitedhealthgroup.com/content/dam/UHG/PDF/2018/AddressingTheOpioidCrisis_UHG.pdf (admitting
that "[f]our in five new heroin users start out by misusing prescription painkillers and turn to heroin when their
prescriptions run out or become too expensive.").

factor for heroin addiction. Individuals who used prescription opioids who have turned to heroin are now frequently exposed to illicit fentanyl, with even more lethal effects.

6.     As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans of every age from 22 to 68.[4]

7.     In the words of Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public health emergency. Since that time, Health and Human Services Secretary Xavier Becerra has twice renewed the determination that "a opioid public health emergency exists nationwide."[5]

8.     Similarly, in May of 2017, then Anne Arundel County Executive Steven R. Schuh sent a letter to doctors and prescribers, noting that "most of our constituents with substance-use disorders began their path to addiction after forming dependencies to opioids prescribed as a result of an injury or other medical issue."[6] He went on to note that their "opioid dependence may have led to obtaining illegal street opioids like heroin, sometimes laced with fentanyl, after valid prescriptions ran out."

9.     According to the CDC, the number of drug overdose deaths in the United States increased by nearly 30% from 2019 to 2020 and has quintupled since 1999.[7] Nearly 75% of the 91,799 drug overdose deaths in 2020 involved an opioid.[8] From 1999 to 2020, more than 263,000 people died in the United States from overdoses involving prescription opioids.[9]

---

[4] https://injuryfacts.nsc.org/all-injuries/deaths-by-demographics/deaths-by-age/
[5] https://aspr.hhs.gov/legal/PHE/Pages/Opioid-22Dec2022.aspx
[6] Phil Davis, *Police: Opioid overdose spike in Anne Arundel Due to Prescription Painkillers*, Capital Gazette, July 22, 2017.
[7] https://www.cdc.gov/opioids/basics/epidemic.html.
[8] https://www.cdc.gov/opioids/basics/epidemic.html.
[9] https://www.cdc.gov/drugoverdose/deaths/prescription/overview.html.

10.    The rate of fatal drug overdoses in Maryland has increased over time as well. Drug overdose death rates increased in Maryland from 11.7 per 100,000 in 2011 to 42.8 per 100,000 in 2021.[10] In 2021, there were 2,460 opioid overdose deaths in Maryland, which accounted for 90% of all drug overdose deaths in the state.[11]

11.    In Anne Arundel County, from 2017 to 2021, opioid-related deaths accounted for 9.16 percent of total opioid related deaths in the State. This represents an increase in opioid deaths of 5.56 percent from 2017 to 2021. [12] In 2020 the number of overdose deaths in Anne Arundel County remained high, with 149 fatal opioid overdoses that year - an 18.3% increase from 2019.[13] Tellingly, the Anne Arundel County Police Department started a unit devoted exclusively to fatal overdose cases.[14]

12.    The loss of each of these individuals cannot be adequately conveyed by statistics, nor can the depth and breadth of the impact on those who survive. Because the addictive pull of opioids is so strong, relapse is more common than with other drugs.

13.    The damage inflicted cuts across ages and generations. Many who have succumbed to overdoses have overdosed more than once. Those who overdose are often not alone at the time. Family members, including young children, have watched their loved ones lose consciousness or die. Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opiates.

14.    Further, overdose deaths are not the only consequence. Children are being displaced from their homes and raised by relatives or placed in the care of Anne Arundel County due to

---

[10] https://www.kff.org/statedata/mental-health-and-substance-use-state-fact-sheets/maryland
[11] https://www.kff.org/statedata/mental-health-and-substance-use-state-fact-sheets/maryland.
[12] Maryland Opioid Operational Command Center, Review of Demographic Overdose Trends in Maryland by Local Jurisdiction, available online at https://beforeitstoolate.maryland.gov/wp-content/uploads/sites/34/2023/03/OOCC-Grants-Reference-Demographic-Information-.pdf.
[13] https://www.aahealth.org/wp-content/uploads/2017/12/ord-12-29-2020.pdf
[14] Phil Davis, *Anne Arundel Sees New Record for Fatal Opioid Overdoses*, Capital Gazette, December 12, 2017.

parents' addiction. Others lose the chance to go home. Unable to be discharged from the hospital with their mothers, babies born addicted to opioids due to prenatal exposure are being placed in the care of the County or local citizens or non-profits who do their best to comfort them through the pain of withdrawal.

15.    The opioid crisis was fueled and sustained by those involved in the opioid supply and payment chain, with manufacturers, distributors, pharmacies, and Pharmacy Benefit Managers ("PBMs"), including ESI, OptumRx, and CVS Caremark each playing a role.

16.    PBMs like Defendants ESI, OptumRx, and CVS Caremark are administrators hired by third-party payers (*e.g.*, government entities, insurers, employers) to design and administer prescription drug programs. They are paid for their services by the third-party payer, as well as through a variety of other avenues they have developed as part of their business model. Their industry began with limited fiscal and administrative functions but has since evolved into far more. Now, "[a]lthough many people have never heard of [them], these powerful middlemen have enormous influence over the U.S. prescription drug system."[15]

17.    Whether by colluding with manufacturers deceptively marketing opioids to alter perceptions of opioids and increase their sales and use, pursuing further profits by placing opioid drugs on their formularies with preferred status and declining to impose limits on their approval for use in exchange for manufacturer rebate payments and fees, ignoring evidence of misuse, addiction, and diversion in the massive data they possess and instead leveraging that data in support of efforts to expand opioid sales and maintain oversupply, failing to report suspicious prescribers to law enforcement, and failing to adequately monitor for, identify, and refuse to fill suspicious

---

[15] https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry (quoting Federal Trade Commission Chair Lina M. Khan)

prescriptions, PBMs have operated behind the scenes to fuel the crisis in multiple respects, while concealing their role and claiming concern for the public health.

18.    PBMs are supposed to work for their clients to reduce prescription drug costs. Yet, over time, PBMs have developed a business model that does the opposite, and in doing so, they have adopted business practices designed to increase the utilization of opioids and maximize their own profits. As a result, far greater quantities of prescription opioids entered the market than Defendants knew could be necessary for legitimate, safe, or appropriate medical uses.

19.    PBMs' overall business practices have not gone unnoticed in Maryland. On July 1, 2018, then Attorney General Brian E. Frosh joined a bipartisan coalition of 30 attorneys general in an amicus brief to the Eighth Circuit Court to regulate the abusive behaviors of PBMs.[16] Frosh stated, "Maryland's ability to protect its consumers from misleading or abusive practices engaged in by PBMs should not be constrained. ERISA was designed to protect consumers, not make them more vulnerable to unscrupulous businesses."[17]

20.    Nationally, a small number of PBMs dominate the market in their sphere. ESI, OptumRx, and CVS Caremark are three of these giants. As of 2022, ESI, OptumRx, and CVS Caremark were the three largest PBMs in the U.S. Each are members of large, vertically integrated corporations. ESI is the self-described manager of the pharmacy benefit for more than 100 million Americans, providing PBM services to its parent, Cigna, as well as to many other insurers and payors. OptumRx provides PBM services to its parent, UnitedHealth, which is the largest commercial drug insurer in the U.S., and to other insurers and payors nationwide. CVS Caremark is the largest PBM in the nation, filling or managing more than 2.3 billion prescriptions in 2022 alone.

---

[16] https://www.marylandattorneygeneral.gov/press/2021/070121a.pdf
[17] https://www.marylandattorneygeneral.gov/press/2021/070121a.pdf

21.     ESI and OptumRx are also among the largest pharmacies in the country, and are owned by two of the largest insurance companies in the world.

22.     CVS Caremark is a subsidiary of CVS Health, whose business includes health insurance and related services, including through subsidiary Aetna, as well as retail CVS pharmacies nationwide.

23.     Defendants are also among the largest or most advanced healthcare data, consulting and analytics companies in the United States.

24.     Defendants have a significant presence in Maryland as well. CVS Caremark was the largest PBM by claims volume in Maryland from 2012 to 2014, with over 25 million claims statewide in 2012. Express Scripts was the second largest PBM by claims volume in Maryland during this time period, with over 13,700,000 claims statewide in 2014. OptumRx has had a significant presence in Maryland as well. In 2015, OptumRx's parent, UnitedHealth Group, Inc. acquired Catamaran Corporation, then the fourth largest PBM in the state by claims volume, and merged it with OptumRx.

25.     Defendants control pharmacy networks that include various retail pharmacies throughout the country, including pharmacies in Anne Arundel County. ESI's pharmacy network includes "nearly 64,000 pharmacies," which it contends provides an available in-network retail pharmacy within a 15-minute drive of "nearly every member's home." OptumRx controls a pharmacy network consisting of approximately 67,000 retail pharmacy locations nationwide. CVS Caremark's pharmacy network consists of approximately 66,000 retail pharmacies, which includes CVS pharmacies, other chain pharmacies, and independent pharmacies nationwide.

26.     Defendants also dispense prescription opioids through their mail order pharmacies, serving patients nationally and throughout Maryland, including in the County.

9

27.    Defendants along with their affiliated companies have more control over and insight into the flow of opioids into communities across the country than any other entities in the pharmaceutical distribution and payment chain.

28.    Because PBMs have access to data for all drug prescriptions written for individuals who receive insurance from an insurer with whom the PBM has contracted, PBMs have a unique insight into prescribing habits at both the patient and prescriber levels, as well as data on prescribing and use of opioids in the aggregate.  Defendants have especially broad and deep insight, because of the expansive reach of their business.  Defendants collectively have access to and analyze opioid utilization data for their approximately 269 million covered lives.  Through that data, Defendants could effectively track the opioid epidemic, pill-by-pill, as it unfolded over decades and chronicle the opioid epidemic in real time.

29.    However, instead of using their data to guard against diversion and public harm, or to report suspicious prescribers, Defendants used it to further their own profits. This included offering services, in exchange for lucrative "administrative fees" ostensibly associated with administering benefits or contracts, to Purdue and other manufacturers of opioids to help them plan their marketing efforts and boost their sales. At the same time, Defendants colluded with manufacturers to further support sales, and Defendants' own profits, through favorable placements of opioids on their standard national formularies without limits on their approval for use, paid for by manufacturers through rebates and fees.[18]

30.    Given Defendants' dominant position in the market and their level of expertise, their clients typically accept their offered baseline standard formularies with little to no

---

[18] While some PBM contracts with customers now require the PBM to pass on 100% of rebates and administrative fees to customers, this was not the case during the majority of the operative time period.  In addition, PBMs continue to enter into contracts with manufacturers requiring manufacturers to pay the PBM based on overall volume of the manufacturers' drug that the PBM dispenses through mail order pharmacies or processes as a PBM.

modifications. This is not surprising, as customers hire PBMs for their specialized knowledge in constructing and managing prescription drug formularies and policing pharmacy networks. In addition, there are often significant financial penalties customers would incur for deviating from standard formularies. Thus, Defendants' formularies effectively control what opioids enter the marketplace and with what restrictions. As such, PBMs are uniquely situated to address the opioid crisis, influence they have admitted in making belated, partial remedial efforts as they came under public scrutiny and pressure.

31.    Indeed, Defendants tout their substantial influence over nationwide drug utilization as one of their strongest selling points to their customers. Defendants are not bystanders in the opioid crisis; they helped fuel the fire.

32.    Defendants *assumed the duty* to serve as the for-profit gatekeeper on dose, frequency and duration of prescription opioids for some 250 million covered lives in the United States. These Defendants were paid billions of dollars from health care plans to ensure safe and efficacious prescribing and dispensing practices. Rather than discharge their duties, they privately contracted with the manufacturers and dispensers of prescription opioids for rebates and discounts driven by drug price and volume. The more pills and the higher the dose, the more revenue the Defendants generated. Defendants endorsed and promoted Purdue Pharma's illegal marketing campaign to encourage broader prescribing practices. Their reckless manipulation of formularies served as a catalyst for opioid abuse, addiction, morbidity and mortality. Defendants willfully ignored internal data demonstrating massive diversion of prescription opioids nationwide.

33.    As a Purdue Pharma internally stated following the placement of Oxycontin on the Express Scripts formulary in October 2001, ████████████████████████████████
████████████████████████████████████████

34.    Defendants' role in creating and sustaining the opioid epidemic is largely hidden from public scrutiny but nevertheless facilitated the reckless promotion of opioids by manufacturers, the oversupply of opioid shipments by distributors, and the irresponsible dispensing of prescription opioids by numerous pharmacies, including through direct support and sales from their own mail order pharmacies.

35.    Defendants' conduct has had a severe and far-reaching public health consequence, the costs of which are borne by the County and its agencies.

36.    Defendants' conduct has created a public nuisance and a blight. County entities, and the services they provide their citizens, have been strained by this public health crisis.

37.    The County brings this suit to help address the devastating march of this epidemic and to hold Defendants responsible for the crisis they helped create.

38.    This lawsuit relates to the Defendants' conduct in the non-federal market which resulted in the increased use, abuse, and diversion of opioids.  The allegations in this Complaint do not include and specifically exclude Defendants' provision of PBM or mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.  The Complaint does not challenge the creation of custom formularies or administration or management of such formularies for or by a federal officer or federal agency, such as for any Federal Employees Health Benefits Act, Veterans Health Administration, or TRICARE governed health benefits plan, or any other federal health benefit plan.  The Complaint does not challenge Defendants' provision of mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the Department of Veteran Affairs, or any other federal agency, and does not challenge the Defendants' administration or

operation of the TRICARE Home Delivery/Mail Order Pharmacy. The Plaintiff does not seek to recover moneys paid by the federal government pursuant to such plans, nor does it seek recovery of federally mandated co-pays that were paid by such plans' patients. The Plaintiff does not seek declaratory relief, injunctive relief, abatement relief, damages, or any other relief for the conduct of any PBM Defendant related to the provision of any services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

**PARTIES**

**A. Plaintiff**

39.     Anne Arundel County, Maryland is a chartered county of the State of Maryland established under Article XI-A of the State Constitution with powers conferred upon it by, *inter alia*, Titles 9 and 10 of the Local Government Article of the Annotated Code of Maryland. Pursuant to Section 103 of the Anne Arundel County Charter, all legal proceedings on behalf of its constituent offices and departments are brought by the County in its corporate name, "Anne Arundel County, Maryland."

40.     Pursuant to Md. Code Ann., Loc. Gov't. § 9-201(2), the County, as a charter county, has the authority to sue.

41.     The County is the 5th largest county in Maryland by population and home to the state capital of Annapolis. The County provides many services for its residents, including public health and law enforcement services, emergency care, and services for families and children.

42.     The County brings this action on its own behalf and in the public interest.

**B. Defendants**

43.     **Defendant Express Scripts, Inc.** is a Delaware corporation registered to do business in Maryland with its principal place of business located at One Express Way, St. Louis, Missouri.

44.     During the relevant time, Express Scripts, Inc. was directly involved in the PBM and mail order services business, as well as Express Scripts' data and research services, nationwide, including in Anne Arundel County.

45.     **Defendant Express Scripts Administrators, LLC** (f/k/a Medco Health, LLC) is a Delaware limited liability company. Express Scripts Administrators, LLC is registered to do business in Maryland with its principal place of business located at One Express Way, St. Louis, Missouri.

46.     During the relevant time, Express Scripts Administrators, LLC provided PBM services in Anne Arundel County, as alleged in this Complaint.

47.     **Defendant Medco Health Solutions Inc.** (f/k/a Merck-Medco Managed Care LLC) ("Medco") is a Delaware corporation registered to do business in Maryland with its principal place of business located at One Express Way, St. Louis, Missouri.

48.     Express Scripts acquired Medco in 2012 in a $29.1 billion deal.

49.     Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States. Medco provided PBM services to approximately 62 million members and provided mail order and data research services to customers nationwide.

50.     Following the merger, the combined company continued under the name Express Scripts. All of Medco's PBM, mail order pharmacy, and data and research business was combined into Express Scripts, and all of Medco's customers became Express Scripts' customers. Express

14

Scripts, Inc. became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.

51.     As a result of the merger, Express Scripts Holding Company ("ESHC") was formed. In 2018, Cigna Corp. purchased Express Scripts Holding Company for $54 billion.

52.     In October of 2020, Express Scripts Holding Company changed its name to Evernorth Health, Inc. ("Evernorth"). Evernorth is the indirect parent of Express Scripts, Inc., along with pharmacy and research subsidiaries that operate throughout Maryland.

53.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is an indirect subsidiary of Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is in Missouri, at the same location as Evernorth.

54.     ESI Mail Pharmacy Service, Inc. dispenses opioids nationwide, and, upon information and belief, dispensed opioids into Maryland, including Anne Arundel County, during the relevant time period as a mail order pharmacy.

55.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth. Express Scripts Pharmacy, Inc. is registered to do business in Maryland with its principal place of business located at One Express Way, St. Louis, Missouri.

56.     Express Scripts Pharmacy, Inc., upon information and belief, dispensed opioids into Maryland, including the County, during the relevant time period as a mail order pharmacy.

57.     Evernorth is the direct parent of and shares a physical address with Express Scripts, Inc., Express Scripts Administrators, LLC. ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, and its website includes links to both Express Scripts "Pharmacy Benefits Management" and "Express Scripts Pharmacy." "Express Scripts Pharmacy" is described as providing home delivery pharmacy services.

58.     As a unit, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions was the third largest dispensing pharmacy in the United States for the 2006 – 2014 time period.

59.     Collectively, Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts," "ESI," or "Express Scripts Defendants."

60.     In 2022, Evernorth, in large part through Express Scripts' PBM and mail order pharmacy business, generated revenue of $140.34 billion, contributing more than 75% of Cigna's revenue in 2022.

61.     Express Scripts Defendants are named for their conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail order pharmacy (i.e. a dispenser).

62.     At all relevant times, Express Scripts Defendants performed these services in Maryland and in Anne Arundel County.

63.     **Defendant OptumRx, Inc.,** is a California corporation with its headquarters in Irvine, California. OptumRx, Inc. is registered to do business in Maryland. OptumRx provides pharmacy benefit management services and mail order pharmacy services nationwide, including in Maryland and Anne Arundel County. OptumRx is a subsidiary of UnitedHealth Group, a healthcare and insurance company.

64.     Prior to 2011, OptumRx was known as Prescription Solutions. OptumRx was created out of a series of mergers and acquisitions.

65.     In 2012, SXC Health Solutions, another large PBM, purchased its rival, Catalyst Health Solutions Inc., in a roughly $4.14 billion deal. SXC Health Solutions renamed the company Catamaran Corp. After this, UnitedHealth Group bought Catamaran Corp in a $12.8 billion deal and merged Catamaran with OptumRx in 2015.

66.     OptumRx and all of its predecessors including, but not limited to, Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. are referred to herein as "OptumRx."

67.     OptumRx provides services to more than 129 million people through a network of more than 67,000 pharmacies.

68.     In 2022, OptumRx's revenue was nearly $100 billion.

69.     **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota and is registered to do business in Maryland. OptumInsight was formerly known as Ingenix, Inc. UnitedHealth Group changed the name in 2011 after the State of New York investigated Ingenix regarding a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

70.     **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation with its principal place of business located in Massachusetts.  It is registered to do business in Maryland.

71.     In 2012, UnitedHealth Group renamed QualityMetric, Inc. to OptumInsight Life Sciences, Inc.

72.     OptumInsight, Inc., OptumInsight Life Sciences, Inc., as well as their predecessors, successors, affiliates, including but not limited to Ingenix, Innovus, Innovus Research, i3,

QualityMetric, Inc., Htanalytics, ChinaGate, and CanReg, are referred to herein as "OptumInsight."

73.    OptumRx, Inc. and OptumInsight are wholly owned subsidiaries of UnitedHealth Group.

74.    OptumInsight provides data, analytics, research, consulting, technology and managed service to companies nationwide. As is discussed below, OptumInsight worked with opioid manufacturers to convince prescribers, patients, and the public, including in the County, that opioids were appropriate for long term use for the treatment of chronic pain conditions and were not addictive.

75.    Collectively, OptumRx and OptumInsight are referred to as "OptumRx," "Optum," or "Optum Defendants."

76.    Optum Defendants are named for their conduct as:

- a PBM;

- data, analytics, and research providers; and

- a mail order pharmacy (i.e. a dispenser).

77.    At all relevant times, Optum Defendants performed these services in or affecting Maryland and Anne Arundel County.

78.    **Defendant CVS Health Corporation ("CVS Health"),** formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. It is registered to do business in Maryland. CVS Health, "together with its subsidiaries (collectively, 'CVS Health,' the 'Company,' 'we,' 'our,' or 'us')," provides retail pharmacy services, health insurance services, and pharmacy benefit management services nationwide.

18

79.    Prior to 2014, CVS Health was known as CVS Caremark Corporation.  When it changed its name in 2014, it announced that its PBM services would continue to be known as "CVS/Caremark."

80.    CVS Health uses the name "CVS Caremark" on its website and in other locations to refer to its PBM services.

81.    In its Annual Report, CVS Health states that "CVS Health Corporation. . . has . . . a leading pharmacy benefits manager" and its "Pharmacy Services segment provides a full range of PBM solutions, including plan design offerings and administration, formulary management, retail pharmacy network management services and mail order pharmacy. . . The Company also provides various administrative, management and reporting services to pharmaceutical manufacturers."

82.    **Defendant Caremark Rx, L.L.C.** is a Delaware company whose principal place of business is at the same location as CVS Health.  Caremark Rx, L.L.C. is a wholly owned subsidiary of CVS Health.  CVS Health has described Defendant Caremark Rx, L.L.C. as "the parent of [CVS Health]'s pharmacy services subsidiaries . . . the immediate or indirect parent of many mail order, pharmacy benefit management . . . [and] insurance . . . subsidiaries, all of which operate in the U.S. and its territories."

83.    **Defendant Caremark PCS Health L.L.C.** is a Delaware company whose principal place of business is at the same location as CVS Health.  Caremark PCH Health L.L.C. provides PBM services to clients nationwide, including in Maryland, and is registered with the Maryland Insurance Administration as a PBM.

84.     **Defendant Caremark, L.L.C.** is a California company with its principal place of business in Illinois.  Caremark, L.L.C. provides PBM services to clients nationwide, including in Maryland, and is registered with the Maryland Insurance Administration as a PBM.

85.     Defendants CVS Health, Caremark Rx, L.L.C., Caremark PCH Health L.L.C., and Caremark, L.L.C. are collectively referred to herein as "CVS Caremark" or "CVS Caremark Defendants."  CVS Caremark is the largest PBM in the country with more than 110 million members as of 2022.  Its 2022 revenue was approximately $169.2 billion.

86.     CVS Caremark Defendants are named for their conduct as:

- a PBM; and

- a mail order pharmacy (i.e. a dispenser).

### JURISDICTION AND VENUE

87.     This Court has subject matter jurisdiction over this action.  Defendants have substantially contributed to the creation of a public nuisance in Anne Arundel County, and the Anne Arundel County Office of Law has the right and authority to prosecute this case on behalf of the People.

88.     This Court has personal jurisdiction over Defendants under Md. Code Ann., Cts. & Jud. Proc. § 6-103. Defendants have submitted to jurisdiction by conducting and transacting business in Maryland on a regular and continuous basis, providing PBM services and mail order pharmacy services to entities and individuals throughout Maryland, and providing data analytics services to entities in Maryland or directed toward Maryland, and by committing acts in violation of the laws of Maryland and the United States.

89.     Venue as to each Defendant is proper in this judicial district, pursuant to Maryland Code Ann., Cts. & Jud. Proc. § 6-201.

## FACTUAL ALLEGATIONS

### A. A FEW LARGE PBMS EXERT SUBSTANTIAL INFLUENCE IN A WAY THAT IS OFTEN NOT TRANSPARENT, EVEN TO THEIR CUSTOMERS.

***What are PBMs?***

90.     "Pharmacy Benefit Managers (PBMs) are a little-known but important part of the process by which many Americans get their prescription drugs," and are "a key player in the prescription-drug supply chain[.]"

91.     "According to the Pharmaceutical Care Management Association (PCMA), the PBM trade group, PBMs process prescriptions for the vast majority of Americans." Although there exist dozens of PBMs nationwide, a select few, including Defendants, dominate the market, as described above.

92.     PBMs are companies that administer prescription drug plans for entities that include insurers, self-insured employers, and state and local government agencies (collectively, these entities are referred to as "plan sponsors").[19]  PBMs review and pay claims.  PBMs also review and decide "which medications are most effective for each therapeutic use."

93.     PBMs design prescription drug benefit programs and create national formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed. They determine the number of pills per prescription, number of refills permitted, any pre-authorization requirements, co-payment amounts, and other criteria. PBMs thereafter commit to monitor their customers' drug plans and monitor their customers' utilization, including through concurrent drug utilization review ("Concurrent DUR" or "cDUR").

---

[19] PBMs also administer prescription drug plans for federal government agencies.  As explained *supra* at ¶ 38, the County's allegations herein do not include and specifically exclude Defendants' conduct in administering drug plans for federal government entities.

94.     Concurrent drug utilization review involves the PBMs real-time evaluation of drug therapy for potential problems, including over-utilization and clinical abuse/misuse of prescribed drugs. Defendants' cDUR terms in their standard client contracts required them to conduct concurrent DUR at the point of sale on all prescriptions.

95.     A PBM's plan can determine what medications will (or will not) be available, at what quantity and dosage, and how difficult it may be for a patient to receive that medication (e.g., by requiring pre-authorization).

96.     A drug formulary is a list of generic and brand name prescription drugs covered by health plans. They are the pathways by which opioids and other drugs are dispensed across the country. Formularies are usually divided into three to five tiers that determine consumers' cost-share amounts, or the co-payment or co-insurance consumers must pay toward the cost of a prescription. The lower tiers have lower cost-share amounts than the higher tiers. For example, a typical three-tier formulary may be designed as follows:

> Tier 1: contains generic drugs with the lowest cost-share amount for consumers;
>
> Tier 2: contains preferred brand-name drugs with a cost-share amount that is higher than tier 1 but lower than Tier 3;
>
> Tier 3: contains non-preferred brand-name drugs with the highest payment by consumers.

97.     In essence, because PBMs choose which drugs appear on their formularies and their standard formularies are adopted by a large number of health insurers and payors, they wield significant influence over which drugs are disseminated throughout the County and how those drugs are paid for.

98.     At the pharmacy counter, PBMs can implement "Utilization Management" ("UM") tools, which help to control the flow of prescription drugs. These tools include quantity limits,

refill limits, prior authorizations ("PA"), and step edits (which require that a patient try a safer or less expensive drug before being given a more dangerous or more expensive one).

99.    PBMs wield direct, intentional control and influence over the prescribing, dispensing, reimbursement, and consumption of opioids.

100.   Defendants' standard plan designs and formularies control:

    a.   Which opioids will be available (or not available) to patients;

    b.   In what quantities the opioids will be dispensed;

    c.   At what co-pay the opioids will be dispensed;

    d.   What level of authorization will be required for the dispensing of opioids to a consumer patient; and

    e.   What less addictive pain treatments, beneficial drugs or other treatments will not be available.

101.   Defendant ESI performed all these tasks for various large insurers in Maryland, thereby administering prescription drug plans for thousands of Anne Arundel County residents. ESI performed these tasks for County residents who received insurance from their employers or other payors that utilized ESI as a PBM.

102.   Defendant OptumRx performed these tasks for County residents, in connection with its role as a PBM for County residents who received insurance from their employers, or other payors that utilized OptumRx as a PBM.

103.   Defendant CVS Caremark also performed these tasks for County residents, in connection with its role as a PBM for residents who received insurance from their employers or other payors that utilized CVS Caremark as a PBM, including the County.

104.   Defendants represent to their clients, patients, and the public that they design their formularies and drug programs in a manner that promotes safe use and appropriate prescribing of opioids.  For example, ESI claims that its Pharmacy and Therapeutics Committee (the "P&T

Committee") considers drug safety and efficacy and that it "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy." ESI also claims that it uses drug utilization review to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to . . . pharmacies" and that it will "alert the dispensing pharmacy to detected issues." OptumRx and CVS Caremark make similar claims. In actuality, Defendants have designed their formularies and benefit programs in a manner that maximizes their own profits and have refused to use their drug utilization review process to identify and control opioid misuse, fueling the opioid crisis as a result.

***PBMs and Financial Incentives from Manufacturers***

105. Opioid manufacturers cannot effectively influence drug prescribing and opioid utilization alone. Other participants in the drug distribution and reimbursement system play key roles in the availability of their opioids.

106. Using their market power, PBMs, including Defendants, require and receive incentives from manufacturers to keep certain drugs on and off formularies. They also receive incentives from manufacturers through lucrative administrative fees.

107. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization and other utilization management tools that would slow down flow, such as quantity limits, refill limits, and step edits. PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

108.    Generally, prescription drug manufacturers pay higher rebates for preferred formulary placement on lower tiers (i.e., tier 2 status instead of tier 3 status). This is because prescribers are more likely to write prescriptions and consumers to fill prescriptions for drugs with lower cost-share amounts.

109.    Higher priced drugs will typically generate higher rebates. This creates an incentive to grant favorable formulary placement to brand-name, higher priced drugs such as OxyContin, a frequently diverted opioid.

110.    Under a traditional PBM pricing model, PBMs retain a portion of the payments they receive from prescription drug manufacturers and return the remainder to their third-party health plan clients. Administrative fees are not passed on, which has prompted disputes and concerns over whether rebate payments are being disguised as other revenue, such as administrative fees.

111.    Since 2014, payments to PBMs by manufacturers as rebates or fees to ensure the formulary placement of their drugs have risen by 16% per annum, and now constitute 40% or more of branded prescription drug costs.

112.    The rebates PBMs negotiate are highly confidential and, for the most part, the exact terms of the agreements between PBMs and prescription drug manufacturers are unknown to others in the supply chain and their customers – creating a pricing black box.

113.    Additionally, Defendants obtain revenue through fees from maintaining pharmacy networks, profiting from the "spread" between what clients pay them for generic prescription drugs and the amounts the PBMs reimburse to pharmacies.  In addition, retail pharmacies pay Defendants fees for every opioid sold, and Defendants reimburse the pharmacies based on the lowest available published prices while paying their own mail order pharmacies based on higher published prices

for the same drugs. In other words, the more filled prescriptions a PBM administers, the higher profit it earns.

114.    Defendants further increased their profits from generic opioids by failing to put into place utilization management tools that would have reduced illegitimate use and dissemination of these drugs.

115.    Defendants resisted efforts to limit access to prescription opioids due to the revenue generated from the dispensing of opioids and concerns about the impact on the rebates Defendants received from opioid manufacturers.  It was only well after the opioid epidemic had reached its peak and public pressure had mounted that the Defendants began to utilize their unique access to data to implement utilization measures to address the unfettered access to prescription opioids which they helped create.

116.    Much of this activity is not transparent to anyone, including those who, in good faith, hire PBMs to manage their benefits. Defendants used their position to collude with manufacturers, prioritizing their own profits instead of public health.

117.    Defendants link opioid manufacturers to prescribing physicians, pharmacists, clients, and consumers with the objective of influencing drug utilization. Internal documents revealed that the ████████████████████████████████████████████████████ ████████████████████████████████████████

118.    As part of their business model, Defendants offer services to assist manufacturers in the marketing of drugs in other ways as well, as described further below.

119.    On information and belief, and as described below, Defendants engaged in all these practices in Maryland generally and in the County specifically.

**B. DEFENDANTS HAD ACCESS TO DATA INDICATING DIVERSION, MISUSE, AND ABUSE OF OPIOIDS BUT FAILED TO USE IT TO MAKE MEANINGFUL EFFORTS TO PREVENT DIVERSION**

120.    Armed with a wealth of information and data, Defendants knew or should have known of the dangerous prescribing patterns that demonstrated issues like diversion, misuse, abuse, doctor shopping, overdose, and outsized use in the County. Yet, upon information and belief, Defendants took no meaningful steps to report or address outlier prescribers or pharmacies or to otherwise rein in the facially suspicious volume of opioids being dispensed in the County or throughout the country.

121.    Instead, as described further below, Defendants provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though they knew that dangerous numbers of opioids were being utilized in the County and the nation and were causing an unprecedented crisis of addiction, overdose, and death.

122.    For the entire relevant time period, Defendants have had access to extraordinary data which they extensively review and analyze for various profit-making business objectives.

123.    ESI has publicly acknowledged its unique ability to collect data. An ESI representative has stated, "Because Express Scripts interacts with patients, pharmacies, prescribers, payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under pharmacy benefit."

124.    OptumInsight's predecessor, Ingenix, described itself as having ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████

125.    CVS Caremark's Senior VP and Chief Analytics Officer has stated, "[A]s a pharmacy benefit manager (PBM), CVS Caremark has access to millions of pharmacy claims, which allow a real-time look at the pharmaceutical market, enabling us to identify trends and patterns that can affect payors' benefit spend. Analysts can also identify which plans could be most impacted by these trends."

126.    Defendants recognize the value of their data. 

127.    Apart from their research arms, Defendants can monitor their clients' opioid utilization and the overall utilization of particular opioids.  They have extraordinary data across the opioid supply chain, including data showing:  the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data.  Defendants also track the number of opioids that move through their own mail order pharmacies.

128.    At the individual level, Defendants could monitor their data to identify conduct commonly associated with opioid misuse, addiction, and diversion, such as early refills of opioid prescriptions, multiple prescriptions for one individual or for dangerously high volumes or dosages

of opioids or "doctor shopping," the practice by which individuals receive multiple opioid prescriptions from unknowing prescribers. On the prescriber level, they could identify problematic prescribers who were prescribing unreasonably high volumes of opioids to unreasonably high numbers of patients, co-prescribing opioids with drugs commonly abused with them, such as benzodiazepines or the "Holy Trinity," prescribing opioids outside the regular scope of their practice, or who wrote prescriptions for the same dose and duration to all of their patients – all classic signs of "pill mills."

129.    Thus, Defendants, like other PBMs, can see detailed information on individual prescribers, prescriptions, and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility is both uniquely granular and comprehensive.

130.    For example, in 2013, an OptumInsight Life Sciences consultant forwarded an article █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

131.    ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

132.    CVS Caremark admits that its technology can provide a "single view of the member" and can "translate critical data into solutions that help to deliver unparalleled care."

133.    OptumRx's evaluation of its own data in 2017 further demonstrates the information Defendants have always had at their fingertips and what they could have done with it. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

134.    Defendants tracked pill-by-pill data by employing advanced data analytics collected from hundreds of millions of pharmacy claims. The data showed nearly every aspect of the pills' movement through the prescription drug distribution and payment systems.

135.    Defendants had access to all of this data well before Maryland and other states established their Prescription Drug Monitoring Programs in order to perform these analyses and stem the tide of the opioid crisis.

136.    Furthermore, by 2011 at the latest, Defendants had been put on notice by the Centers for Medicare and Medicaid Services (CMS) that all actors involved in the delivery of healthcare in the United States needed to take steps to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis. In September of 2011, CMS sent a memorandum to "All Part D Sponsors," which included the Defendants or their predecessors, advising all recipients that Medicare data showed overutilization of opioids that was "highly indicative of drug seeking behavior due to drug abuse or diversion." The notice urged recipients to put adequate controls in place, such as thresholds for appropriate dosing and denial of payment for any claims in excess of thresholds.

137.    CMS sent similar notices later in 2011, emphasizing the need for sponsors to identify and report potential fraud and abuse (*e.g.* drug seeking behavior) and in 2012. The 2012 notice included guidance on improving drug utilization review controls.

138.    Defendants represented that they would identify potential fraud and abuse, giving rise to an expectation that they were identifying and addressing instances of over-prescribing and diversion.  Instead, they were making business decisions to increase their bottom line while eliminating patient safeguards in exchange for more lucrative contracts with manufacturers.

139.    Although Defendants were acutely aware of the opioid epidemic, they failed to use their extensive data to combat it, and instead helped to maintain the flow of opioids. ███████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

140.    ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ But ESI's own data demonstrated these problems as well.

141.    ESI was directly involved in the administration of Purdue's Indigent Patient Assistance Program ("IPAP"), ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████

142.    ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████ Although the data could have been readily used to detect potential addiction and misuse, the Purdue-ESI partnership was focused more on ensuring the continued availability of Purdue's opioid products.

143.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

144.    Through the IPAP program in particular, ESI had a ringside seat to, and an active role in, the earliest rounds of the opioid epidemic. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

145.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

146. 

147.

148.

149.

150.    Outside of the IPAP program, ESI's own data capacities allowed the company to identify inappropriate use and prescribing of opioids, as seen in drug trends reports, research posters, and the 2014 ESI report *A Nation in Pain*. The report discussed the results of ESI's review

of 36 million opioid pharmacy claims, and detailed the indicia of the opioid epidemic that was apparent in the data. *A Nation in Pain* notes that the study found that 60% of patients using opioids were taking a dangerous combination of drugs that are potentially fatal, such as benzodiazepines with an opioid. The study also noted that a separate ESI study that analyzed ESI's data found that 40% of opioid prescriptions filled by members with employer sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.

151.    This unique access alerting ESI to the problems with opioids, should have triggered a robust data review to identify signs of misuse, abuse and diversion.  This is particularly true,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███    Yet, ESI continued its efforts to reduce barriers to OxyContin use, and promote higher volumes of opioid prescribing.

152.    While Defendants had some programs aimed at identifying high narcotic usage among patients, these programs were limited in scope and availability, and were window dressing, at best. For example, ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

153.    Likewise, in 2016 the Optum Defendants ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

154.    CVS Caremark began placing some limits on opioid prescriptions in 2018, but it could have acted far earlier given CVS Health's first-hand experience with the problems of opioid addiction and diversion.[20]

155.    Defendants knew or should have known from their own data that opioid abuse, overdose, and diversion were rising with the increasing amount of opioids that were being dispensed in the County and the surrounding communities—and yet they failed to take any of a number of steps they could have taken to stop it.   For example, Defendants could have implemented policies that provided easier access to non-addictive forms of pain relief, or that covered alternative, non-medication treatments for pain, or made addiction treatments more accessible.

156.    Defendants, however, continued to prioritize their profits and decline to do anything meaningful about the opioid crisis.

157.    ████████████████████████████████████████████

███████████████████████████████████████████████████

---

[20]https://www.statnews.com/2017/09/21/cvs-opioid-prescription-limits/;https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.



158.

## C. DEFENDANTS WORKED DIRECTLY WITH MANUFACTURERS TO BOOST OPIOID SALES AND AID DECEPTIVE MARKETING

### 1. Background on Opioid Manufacturers' Deceptive Marketing of Opioids

159.   As Purdue developed OxyContin in the mid-1990s, it knew that to expand its market and profits, it needed to change the perception of opioids from medications that were appropriate only for short-term acute pain or for palliative (end-of-life) care to medications that could be used long-term for widespread chronic conditions, like back pain, migraines, and arthritis. Purdue, together with other opioid manufacturers, such as Teva, Janssen, and Endo, cultivated a narrative that pain was undertreated and pain treatment should be a higher priority for health care providers, and that opioids were safe, effective, and appropriate for long-term use for chronic, routine pain conditions.   There were no studies that supported the claim that opioids were appropriate for chronic pain, and the manufacturers failed to disclose the lack of evidence that opioids were safe or effective long-term or the other risks from long-term use of opioids.  Purdue and other manufacturers misrepresented the risk of addiction for pain patients as modest, manageable, and outweighed by the benefits of opioid use.

36

160. Purdue and other manufacturers spent hundreds of millions of dollars on promotional activities and materials that continued to falsely deny or trivialize the risk of addiction and overstate the benefits of opioids. They deceptively marketed opioids to prescribers through advertising, websites, and in-person sales calls. They also relied upon paid physician speaker programs, continuing medical education ("CME") seminars, non-credit education programs, treatment guidelines, mass mailings to physicians and patients, and other publications and programs they developed with patient advocacy groups, professional associations, paid physicians, and other third parties, including Defendants, to spread their misleading messages.

161. The misrepresentations included claims that:

    a. patients receiving opioid prescriptions for pain generally would not become addicted, and that doctors could use screening tools to exclude patients who might;

    b. patients who did appear addicted were not; they were instead "pseudoaddicted" and needed more opioids;

    c. opioids relieved pain when used long-term and were appropriate for use for chronic pain conditions;

    d. opioids could be taken in higher and higher doses (without disclosing the increased risk to patients);

    e. OxyContin provided 12 hours of relief (when Purdue knew that, for many patients, it did not);

    f. opioids would improve patients' function and quality of life (while trivializing or omitting the many adverse effects of opioids that diminish patients' function and quality of life).

162. Between the 1990s and 2011, prescriptions of oxycodone, an active ingredient in OxyContin and other opioid drugs, more than doubled in the United States. During the same time period, opioid prescriptions increased some 31% from approximately 1.6 million to approximately 2.2 million. According to a U.S. Department of Health and Human Services Fact Sheet, "[i]n

2014, more than 240 million prescriptions were written for prescription opioids, which is more than enough to give every American adult their own bottle of pills."

163.    The opioid manufacturers have faced substantial civil and criminal liability for their roles in contributing to the opioid public health crisis, and have agreed to pay billions of dollars to address the devastation caused by their misleading marketing and other misdeeds. For example:

      a.  In 2007, Purdue agreed to pay approximately $600 million in fines and other payments to resolve criminal and civil charges related to the company's misrepresentations regarding OxyContin's addiction and abuse risks;

      b.  In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil allegations related to its marketing of OxyContin;

      c.  In February 2022, the largest U.S. drug distributors and opioid manufacturer, Janssen, agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that they helped fuel the opioid epidemic;

      d.  In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation regarding its role in the opioid crisis; and

      e.  In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

**2. Defendants Worked Directly with Manufacturers to Increase Opioid Sales**

164.    Defendants worked directly with Purdue and other manufacturers to ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

165. 

166.

167.

168.

169.

██████████████████████████████████████████████████████

██████████████████ Upon information and belief, these refer to sales roles, such as account

executives. ████████████████████████████████████████

███████████████████████████████████

170.    ESI cooperated with Purdue and other manufacturers to pursue profits by ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

171.    ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

172.    ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



173. ███████████████████████████████████████████

174. ███████████████████████████████████████████

175. ███████████████████████████████████████████ This conduct, and the other conduct described herein, aided the overall effort by Purdue to deceptively inflate the benefits of opioids while downplaying their dangers.

176. CVS Caremark ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

177.    In 2008, five years after the FDA issued a Warning Letter to Purdue for misleading advertisements, CVS Caremark ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

178.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

179.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

180.    Purdue worked closely with OptumInsight, UHC, and OptumRx.    ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



181.    Optum provided research and evidence to Purdue to support the expansion of the opioid market and promotion of beneficial use of opioids ████████████████████████ ██████████████████████ A few examples are:

a.

b.

c.

d.

182.



Thus, Optum had direct knowledge of ███████████████████████████

183. ████████████████████████████████████████████

184. Optum knew from its own data that opioid abuse, overdose, and diversion were rising with the increasing amount of opioids that were being prescribed and dispensed, which contradicted Purdue's marketing claims that OxyContin was appropriate for chronic pain patients because, among other misrepresentations, addiction was unlikely. Yet Optum continued to partner with Purdue and other opioid manufacturers in their efforts to increase utilization of opioids, continued to give OxyContin and other opioids preferred status on formularies, and continued to resist the implementation of utilization management tools at the manufacturers' behest.

185. Optum not only worked with Purdue, but other opioid manufacturers as well. █

186. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

187.  Like ESI, OptumRx admittedly understands that ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

188. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



189.   More recently, in 2020, UnitedHealth Care, a subsidiary of UnitedHealth Group, filed a proof of claim in Purdue's bankruptcy seeking $9.8 billion because it was the alleged victim of deceptive opioid marketing. The claim form alleges that "[P]urdue spent millions of dollars on promotional activities and materials that falsely den[ied] or trivializ[ed] the risks of opioid use while overstating the benefits of using opioids for chronic pain." Like Optum's presentation, it neglects to mention, however, Purdue's spending on the marketing consulting work performed by Optum.

### D. DEFENDANTS FACILITATED AND ENCOURAGED THE USE OF OPIOIDS AND FLOODED THE MARKET THROUGH SELF-SERVING FORMULARY AND MANAGEMENT DECISIONS.

190.   Defendants exert significant control over the prescribing, use, and distribution of opioids throughout the nation, including in Anne Arundel County.  As described above, Defendants determine what drugs are included on their formularies and, as such, what drugs will be reimbursed.  In doing so, Defendants control what drugs are dispensed by pharmacies and used by patients.  Manufacturers tout formulary status of their drugs when marketing the drugs to prescribers, a fact that Defendants were well aware of but was not known to the County.

191.   Defendants are contractually obligated to negotiate formulary placement and rebates on behalf of their clients, for their clients' benefit, and their rebate negotiations and formulary decisions are supposed to be consistent and in accordance with their clients' larger,

overall interests of providing safe and affordable drugs to their members. Defendants know that their clients rely on them to perform their functions in the clients' and patients' best interests. Nevertheless, in pursuit of profits, the Defendants intentionally disregarded these obligations, to the detriment of communities around the country, including Anne Arundel County.

192.    Defendants' formularies are heavily influenced by their financial agreements with drug manufacturers, which encourage the use of opioids through preferred formulary placement and ease the prescribing of opioids by lowering copayments and failing to require prior authorization, quantity or dosage limits, or other restrictions on opioid prescriptions.

193.    As previously discussed, prior authorization requires advance approval from a health plan before a prescription drug is delivered to the patient to qualify for insurance coverage. Prior authorization requirements aim to ensure that a medication is necessary or that the patient filling the prescription meets the medical criteria for the use of the medication. These requirements impose an additional but important hurdle to prescribing, which can reduce the illegitimate use and overuse of certain high-risk medications like opioids. ██████████████████

███████████████████████████████

194.    ESI's relationship with Purdue demonstrates the inherent problems in these agreements with opioid manufacturers, as well as the way ESI used them to its own advantage. ESI's early preferential treatment of OxyContin facilitated the widespread use and over-use of the drug nationally and in the County, paving the way for the opioid epidemic. Motivated by its own profits, ESI gave OxyContin preferred formulary status on its national formularies and acceded to Purdue's request not to impose prior authorization or other limits on the use of OxyContin.

195.    ████████████████████████████

████████████████████████████████



196.

These early payments helped gain acceptance and use of OxyContin in the key early years after its launch and laid the foundation for the over-use, misuse, diversion and other harms that followed.

197.

198.

199.

200.

201.

████████████████████████████████████████████████████

████████████████████████████

202.    ESI knew that its placement of OxyContin on formulary as a preferred drug ██████

██████ In 2012, an ESI executive acknowledged that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ Nevertheless, ESI's preferred placement of OxyContin continued.

203.    While ESI represents publicly that it approves drugs for its formulary through exhaustive clinical review based on their efficacy and appropriateness, as well as cost, it was actually ESI's rebates that drove its decisions. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

204.    ESI also allowed Purdue to undermine the policy for prior authorizations, as the enticing rebates Purdue offered and paid to ESI were conditioned on the elimination or easing of requirements for prior authorization or other restrictions on OxyContin, while also easing availability of OxyContin by lowering copays. Thus, in sum and substance, Purdue paid ESI in

order to make OxyContin more available to patients – and ESI complied. As concerns arose regarding quantities prescribed, ESI again prioritized profits from Purdue over health and safety.

205.    In its rebate relationships with PBMs, Purdue prioritized preventing the imposition of prior authorization and other requirements that would limit access to opioids. A former Purdue official responsible for ensuring favorable treatment for OxyContin explained, "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug." The former Purdue official's relationship with Medco was especially important, so much so that, upon information and belief, Purdue moved her geographically to be closer to Medco's New Jersey headquarters.

206.    ESI bowed to Purdue's wishes. For example, as described by a media outlet which obtained unsealed court records from litigation in West Virginia, state officials planned to require prior authorization for OxyContin after noticing a surge in deaths attributable to oxycodone, the branded drug's active ingredient, in 2001. Specifically, 2004 deposition testimony revealed that state officials contacted Medco, with whom it contracted to manage the state's employee health plan, and asked the PBM to put in place a plan to limit OxyContin prescribing, but "basically they were refused." Another state official described similar resistance, testifying that the PBM "felt strongly, and [it was] very, very reluctant or resistant."

207.    ESI even used its large-scale data in an effort to avoid implementing such restrictions, suggesting that in areas other than West Virginia "there were not that many prescriptions for OxyContin, it was not that much of problem."

208.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

209.    Lucrative rebates drove not only decisions regarding formulary placement and prior authorization requirements, but also quantity limits. PBMs determine criteria such as the number of pills per prescription. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

210.    █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

211.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

212.    ESI recognizes that quantity matters when it comes to the abuse and diversion of opioids, and has acknowledged the problem of excess supply, stating that six in ten patients had or expected to have leftover opioids. Express Scrips has also acknowledged that, "[w]ith a 10-day supply of opioids, 1 in 5 become long-term users." It further cited information from the CDC

showing that 25% of long-term opioid users struggle with addiction, while one in thirty-two people with dosages above 200 MME per day die.

213.    

214.    But ESI had long been aware of the effectiveness of UM tools.

215.    Optum has also recognized that the volume of opioids dispensed is directly related to the levels of abuse and diversion in the community. According to a "white paper" from the company, "[a]s opioids flooded the market, unused drugs became vulnerable to sale, theft or misuse." As UnitedHealth Group put it, "[t]he unprecedented volume of prescription painkillers in the market and the leftover supply sitting in homes have triggered inappropriate use—a major contributor to overdose and a potential gateway to heroin."

216.    OptumRx had similar rebate arrangements with Purdue Pharma and other opioid manufacturers and, because of its financial interests, provided favorable formulary status to and

failed to impose reasonable restrictions on opioids that were prescribed, dispensed, and used in the County.

217.    

218.    Despite its knowledge of misuse and diversion of prescription opioids, OptumRx encouraged the use of highly addictive opioids through its formulary policies. For example, in one case, OptumRx suggested that a member using a Butrans patch consider switching to lower cost but more highly diverted alternatives, such as OxyContin or extended-release morphine.

219.    Furthermore, UnitedHealth, including its subsidiaries, "places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."

220.    ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████

221. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

222. As late as 2017, ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

223. Like ESI and OptumRx, CVS Caremark's rebate agreements ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ Although CVS Caremark acknowledges that one of the purposes of formularies is to "help the PBM provide pharmacy care that is clinically sound," ████████████████████



224.    CVS Caremark's ███████████████████████████

225.    Rebates paid by Purdue and other manufacturers to CVS Caremark ensured that utilization measures were not placed on preferred opioid prescriptions. During the majority of the relevant time period, CVS Caremark had three basic formularies: Standard Control, Advanced Control, and Value. The basic Standard Control formulary did not contain step therapies, prior authorization requirements, or quantity limits for opioids. CVS Caremark's basic Advanced Control formulary also did not contain step therapy, prior authorization requirements, or quantity limits for opioids. The basic Value formulary contained no step therapies for immediate release opioids. It did include prior authorization for some opioids, but not for the most widely abused opioids, such as hydrocodone-acetaminophen, oxycodone-acetaminophen, and codeine-acetaminophen. In addition, for much of the relevant time period CVS Caremark's basic formulary did not require prior authorization when opioids were prescribed for chronic pain, nor did it require prior authorization before dispensing immediate-release opioids.

226.    Defendants also provided cash discount cards that allowed patients to access opioids that were not covered by insurance. Filling a prescription using a cash discount card could avoid health-plan limits.

227.    OptumRx refused ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

## E. DEFENDANTS' PUBLICITY OF BELATED EFFORTS EFFECTIVELY ADMITS THEY COULD HAVE ACTED SOONER

228.    The belated steps that Defendants took demonstrate their ability to reduce the supply of opioids through appropriate formulary management steps that could, and should, have been taken far earlier.  Even when the Defendants did make these steps available, they were not put in place across the board, but were offered to clients as an option for an extra charge.

229.    It was not until far too late, in 2017 at the 21st Annual Express Scripts Outcomes Symposium, that ESI announced a "solution" to lower the risks of opioids at each touchpoint of the care continuum "from safe disposal, to tools for physicians at the point of care and safety checks for dispensing pharmacies." By then, it was much too late for the thousands of Anne Arundel County residents who were suffering from opioid addiction.

230.    ESI communicated in its 2017 Drug Trend Report that they made several efforts around the opioid epidemic including:

> [E]xtraordinary progress in reducing the amount of unnecessary and dangerous dispensing of opioids to our members through the launch of Advanced Opioid Management (Launched in 9/17)
>
> Average days' supply declined nearly 60% in just 90 days for patients in [the] program receiving a first-time opioid prescription.

56

Plans participating in their solution observed a 60% reduction in the average days' supply per initial fill, from 18.6 days to just 7.5 days.

Among commercial plans, the days' supply of opioids dispensed per person per year decreased 10.3%, while utilization of drugs to treat opioid dependence rose 8.5%.

231.    It was not until 2018 when ESI released its Advanced Opioid Management (AOM) program, that ESI put covered patients in greater compliance with the CDC Guidelines. The ESI AOM program includes:

a. First time prescription opioid users are limited to a seven-day supply of short-acting prescription opioids.

b. Prior authorization is required for the first fill of a long-acting prescription opioid.

c. Pharmacy intervention is triggered when patient dosage across all prescription opioids reaches a certain level based on MME per day.

d. Through Express Scripts' proprietary clinical rules engine, the PBM identifies and sends daily alerts to prescription opioid prescribing physicians via their EHR/EMR to make them aware of duplicative therapy, misuse and abuse, medication interactions, use of multiple prescribers or pharmacies, or when their patient is approaching the MME thresholds.

232.    The Advanced Opioid Management programs utilize ESI's ongoing review of claims data that ESI has always had the ability to conduct. There is no legitimate reason why this program, or similar programs, could not have been implemented long before 2018, especially given ESI's early knowledge of the abuse and diversion of opioids.

233.    ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

234.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



235.    Also far too late, OptumRx acknowledged in September 2017 that it is

236.    OptumRx launched an "Opioid Risk Management Program" (ORM) in 2017. The program is advertised as having several components, including "applying evidence-based utilization management protocols after first fill to reduce excessive dosing, limit unnecessary extension of therapy duration, mitigate abuse and diversion, and decrease exposure to harmful drug combinations through real-time medication checks at the point of sale."

████ The final press release notes that "OptumRx's program is showing early but meaningful potential to begin curbing the opioid epidemic in America."

237. OptumRx's Opioid Risk Management program included various strategies, including prevention and education, minimizing early exposure, reducing inappropriate supply, treating at-risk and high-risk patients, and supporting chronic populations and those in recovery.

238. CVS Caremark acknowledged in 2017 that "pharmacy benefit managers play an important role in implementing the CDC guideline, and helping to ensure access and patient safety." In 2018 it announced that it was going to expand two of its "signature" opioid abuse prevention programs – the safe medication disposal program, which provides medication disposal units in CVS pharmacy locations, and the "Pharmacists Teach" program, where pharmacists visit schools and talk to students and parents about the dangers of opioid abuse. It stated it would also work to increase access to naloxone, provide enhanced counseling to CVS Pharmacy patients with new opioid prescriptions, and increase support for addiction recovery programs. Further, it noted that it had implemented criteria to help "adopting" clients manage opioid utilization in a manner consistent with the CDC Guidelines.

239. Defendants had the capability to implement these programs long before 2017, but they did not have the corporate will to do so. Instead, for years, they chose to continue in profitable agreements with Purdue and other opioid manufacturers to give opioids preferred status on their formularies without implementing restrictions for their use, inevitably resulting in increased opioid utilization, increased opioid addiction, and increased overdose and death. They also chose to continue partnerships with Purdue and other manufacturers to provide data, develop research, and provide analyses to assist in manufacturers' deceptive opioid marketing. By 2017, when

59

Defendants decided to take action and develop their opioid programs, more than half a million people had already died from opioid overdose.

**F. DEFENDANTS DISREGARDED THEIR OBLIGATIONS UNDER THE FEDERAL CONTROLLED SUBSTANCES ACT AND MARYLAND LAW IN SELLING OPIOIDS FROM THEIR OWN PHARMACIES.**

240.    ESI, OptumRx, and CVS Caremark operate mail order pharmacies that dispense opioids to patients throughout Maryland and in Anne Arundel County.  As such, Defendants are part of the closed system and are required to comply with the provisions of the federal Controlled Substances Act ("CSA") and its implementing regulations and Maryland law.[21]

241.    Defendants' obligations as registrants included the responsibility to prevent the diversion of opioids.  21 C.F.R. § 1301.71(a); Md. Code Regs. 10.19.03.12.  This includes an obligation to use the information available to them, such as the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of opioids.  Upon information and belief, Defendants failed to utilize this data to detect or guard against diversion, and otherwise failed to meet their CSA obligations.

242.    As mail order dispensers of opioids, Defendants were required to ensure that adequate safeguards were in place to dispense opioids in a safe and effective manner, provide effective controls and procedures to deter and detect theft and diversion, and comply with federal controlled substances laws, such as the requirement to maintain effective controls against diversion.  *See, e.g.* 21 U.S.C. 801, *et seq.*; Code of Maryland Regulations, Title 10 – Maryland Department of Health, Subtitle 19 – Dangerous Devices and Substances, Chapter 3 - Controlled Dangerous Substances Authority.  Defendants failed to meet these obligations.

---

[21] 21 U.S.C. § 801 *et seq.*; Md. Code Regs. 10.19.03.03, Md. Code Regs. 10.19.03.12; Md. Code Regs. 10.34.10.01; Md. Code Regs. 10.34.37.04.

243.    Under the federal Controlled Substances Act and Maryland law, a prescription is legally valid only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 CFR § 1306.04(a); Md. Code Regs. 10.34.10.08; Md. Code Regs. 10.34.37.04.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacies who fills the prescription." 21 CFR § 1306.04(a).

244.    A pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See* 21 C.F.R. §§ 1306.04, 1306.06; Md. Code Regs. 10.34.10.08; Md. Code Regs. 10.34.37.04. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing. Defendants failed to meet these obligations in their mail order pharmacy operations.

245.    Instead, during the period for which ARCOS data is available (2006-2014), ESI shipped over 1 billion dosage units of opioids to individuals across the nation, CVS Caremark shipped nearly 450 million dosage units, and OptumRx's mail order pharmacy was responsible for shipping more than 185 million dosage units.

246.    Further, as described above, ESI shipped opioids to patients of high-volume prescribers being targeted with Purdue's deceptive marketing campaign.

247.    The volume of opioids dispensed by Defendants' mail order pharmacies is not surprising, given how their mail order pharmacies operated to push as many prescriptions as possible out the door, with little or no attempts to identify or resolve red flags.

248.



249.

250.    OptumRx's and CVS Caremark's mail order pharmacies had many of the same problems.

251.    Defendants' mail order pharmacies provided a vehicle for diversion to continue despite efforts to contain it.

████████████████████████████████████████████████████████████

████████████████████████████████████

252.    In 2012, Express Scripts, Inc. and Express Scripts Pharmacy Services, Inc. agreed to pay the U.S. Government $2.75 million to settle a case against the companies. A DEA inspection revealed that from 2002 through 2006, prescription-controlled substances were diverted into illicit channels at several ESI mail order facilities located in Pennsylvania. The diversion included thefts by employees, inventory discrepancies, and failures to report to DEA losses that occurred during the mail order delivery process.  Perhaps most disturbing, the DEA also found that ESI employees generated invalid DEA registration numbers where it lacked registration numbers from pharmacists, which should have been not only a red flag, but an absolute barrier to dispensing these drugs.

253.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

254.    Defendants failed to comply with their obligations under federal and Maryland controlled substance laws and failed to use reasonable care in the operation of its mail order pharmacies, permitting an untold number of opioid prescriptions to be filled and the opioids mailed, even though the pills were likely to be diverted.

## G. DEFENDANTS CONCEALED THEIR UNLAWFUL CONDUCT

255.    Defendants' conduct described herein – colluding with manufacturers deceptively marketing opioids to alter perceptions of opioids and increase their sales, ignoring evidence of

misuse, addiction, and diversion visible in their data and instead leveraging the data in further support of manufacturers' opioid marketing, placing opioids on their formularies with preferred status and without restrictions in exchange for lucrative rebates and fees from manufacturers, failing to maintain effective controls against diversion in their mail order pharmacy operations, and failing to report suspicious prescribers – was concealed from the County and the public at large.

256.   Defendants intentionally undertook efforts to conceal their conduct by misrepresenting their role in the pharmaceutical marketplace as promoting safe and effective use of and appropriate dispensing of opioids, by claiming to be a victim of Purdue's misconduct when they were, in fact, a participant in it, and by failing to make public information in their possession and control that would have revealed the truth regarding their relationships with manufacturers and their financial interest in the increased utilization of opioid medications.

257.   Defendants had in their possession and control information that opioids were addictive, data showing that large amounts of opioids were being diverted from legitimate channels, and information that specific doctors and pharmacies were engaged in improper or illegal conduct.

258.   Defendants fraudulently hid the details of their relationships with opioid manufacturers.

259.   The County did not and could not have known that the Defendants developed their formularies and/or utilization management measures based on profit and rebates, not based on the safety and efficacy of the medications as they claim.

260.   The County did not know and could not have known that the Defendants were partnering with the opioid manufacturers in their deceptive and misleading marketing of opioids.

64

261. The County did not know and could not have known about the volume of opioids that Defendants shipped into the County through their mail order pharmacy business.

262. The County did not and could not have discovered through a diligent investigation information demonstrating that the Defendants were engaged in the misconduct described herein.

263. Defendants did not disclose to the County the details of their financial incentives from Purdue or other manufactures or what they knew regarding problematic prescribers, diversion, and adverse consequences. Defendants used their knowledge and scale for their own benefit, rather than their customers', causing injury to the County.

## H. DEFENDANTS CREATED A PUBLIC HEALTH CRISIS IN MARYLAND BY DRAMATICALLY INCREASING THE AVAILABILITY OF OPIOIDS

264. By their conduct in improperly increasing opioid prescriptions and failing to address evidence of the overuse, abuse, and addiction to opioids and report suspicious prescribers, Defendants, who portray themselves as champions of public health, had financial incentives to sell higher volumes of opioids, and prioritized pursuit of profits over the well-being of the community and even their own clients. This oversupply allowed non-patients to become exposed to opioids and facilitated access to opioids for both patients who could no longer afford or otherwise access prescription opioids and individuals struggling with addiction and relapse. Individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high, and heroin is frequently laced with the even more potent illicit opioid, fentanyl.

265. The effect of the oversupply of opioids in the Anne Arundel County has been striking. Drug overdose death rates increased in Maryland from 11.7 per 100,000 in 2011 to 42.8

per 100,000 in 2021.[22]  In 2020 the number of overdose deaths in Anne Arundel County remained high, with 149 fatal opioid overdoses that year; a 18.3% increase from 2019.[23]

266.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses.  An analysis by a Princeton University economist found that  approximately one out of every three working age men who were not in the labor force took daily prescription pain medication.  The same research found that opioid prescribing alone accounted for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the smaller decline in labor force participation among women.  Many of those taking painkillers said they still experienced pain daily.

267.    The oversupply and overuse of opioids have caused additional medical conditions that have injured residents in Maryland, specifically Anne Arundel County.  A growing number of people have needed medications aimed at treating secondary effects of opioids—including not only addiction and overdose, but also side effects like constipation and sedation.  According to an analysis by the Washington Post, working-age women and men on opioids are much more likely to have four or more prescriptions from a physician (57% and 41%, respectively) than their counterparts who do not take opioids (14% and 9%, respectively).[24]  These secondary-effect medications—essentially, drugs to treat the effects of opioids—generated at least $4.6 billion in spending nationally in 2015, on top of $9.57 billion in spending on opioids themselves.

268.    The oversupply of opioids has also had a significant detrimental impact on children. Children in the County have been removed from homes with substance abuse and placed in foster

---

[22] https://www.kff.org/statedata/mental-health-and-substance-use-state-fact-sheets/maryland
[23] https://www.aahealth.org/wp-content/uploads/2017/12/ord-12-29-2020.pdf
[24] *The drug industry's answer to opioid addiction: More pills*, Ariana Eunjung Cha, The Washington Post, October 16, 2016. (Available online at: https://www.washingtonpost.com/national/the-drug-industrys-answer-to-opioid-addiction-more-pills/2016/10/15/181a529c-8ae4-11e6-bff0-d53f592f176e_story.html).

care.  At any given time, the County has approximately 120 children in need of foster care placement or adoption.  In addition, the County has seen an increase in the number of babies born into families struggling with substance use.  In 2014, there were 74 substance exposed infants born in Anne Arundel County, but by 2016 the number had increased to 374.  Many of these children must receive in-home services and some must be placed in foster care.

269.    Prescription opioid use before high school graduation is related to a 33% increase in the risk of later opioid misuse.[25]  Additionally, the adolescent misuse of opioid medications greatly predicts the later use of heroin.[26]

270.    Even infants have not been immune to the impact of opioid abuse.  There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS").  These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms.  The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction.  When untreated, NAS can be life-threatening.  In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour.

---

[25] U.S. Pharmacist, Legitimate Opioid Use Prior to High School Graduation Increase Abuse Risk, available at https://www.uspharmacist.com/article/legitimate-opioid-use-prior-to-high-school-graduation-increases-abuse-risk.
[26] National Institute of Health, *Prescription Opioid Use is a Risk Factor for Heroin Use,* available at *https://*www.drugabuse.gov/publications/research-reports/relationship-between-prescription-drug-heroin-abuse/prescription-opioid-use-risk-factor-heroin-use.

271.    In Maryland, the number of babies born with alcohol or drugs in their system increased 56.6 percent between 2008 and 2017. The majority of these babies were exposed to prescription painkillers or heroin, while others have methadone or buprenorphine in their systems due to the mothers attempts to overcome opioid addiction. The NAS rate for Maryland in 2018 was 13.7 per 1,000 births, approximately twice the national average.

272.    From 2016-2018, Maryland launched the "Neonatal Abstinence Syndrome (NAS): Improving Care to Improve Outcomes" to standardize the best practices for infants with NAS. Below are some accomplishments that have come from this initiative:

- Length of stay (LOS) in the Neonatal ICU was decreased by 3 days in infants diagnosed with NAS with a cost savings of $1.8 million;

- Transfers out of the birth hospital for infants diagnosed with NAS decreased by 56% (from 16.8% to 7.4%) at the end of the collaborative;

- Maryland named "State of Education Excellence" by the Vermont Oxford Network as 85% of participating hospitals achieved collaborative goals.

273.    The following chart shows Maryland and Anne Arundel County NAS rates from 2008-2017.





274.    Defendants' conduct also created an abundance of drugs available for non-medical or criminal use and fueled a new wave of addiction, abuse, and injury.

275.    Most illicit drug use originates from prescribed opioids.  In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet.  The Partnership to End Addiction reports that "[t]wo-thirds of teens and young adults who report misuse of prescription medicine are getting it from friends, family and acquaintances."[27]

276.    Those who are addicted to prescription opioids are 40 times more likely to become addicted to heroin.  The CDC identified addiction to prescription pain medicine as the strongest risk factor for heroin addiction.  An even more deadly problem stemming from the prescription opioid epidemic involves illicit fentanyl – a powerful opioid frequently combined with and sold as heroin, or combined with other drugs.

277.    Fentanyl is a powerful opioid carefully prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Anne Arundel County communities.  There were 33 fentanyl overdose deaths in the first quarter of 2017 in Anne Arundel County, compared to 17 during the same time period in 2016.  In 2017, 58% of fatal opioid overdoses involved fentanyl.[28]  In 2020, 58% of fatal overdoses still involved fentanyl.[29]

278.    Carfentanil, a powerful derivative of fentanyl, has been found in heroin and fentanyl sold illicitly.   Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants, and has been researched as a chemical weapon.  A dose the size of a grain of salt can rapidly lead to deadly overdose in humans.  Law enforcement

---

[27] https://drugfree.org/article/safeguard-against-medicine-abuse-securing-and-disposing-medications/.
[28] Anne Arundel County, Maryland, 2017 Opioid Related Data, Presentation, January 31, 2018.
[29] https://www.aahealth.org/wp-content/uploads/2017/12/ord-12-29-2020.pdf

officers who may be exposed to the drug have been warned to handle it with caution because it can be absorbed through the skin. Police officers in Anne Arundel County have had to wear protective gear, such as gloves and eye shields, before handling any drug suspected to contain carfentanil. In the Spring of 2017, six deaths in a six-week period in Anne Arundel County were caused by carfentanil intoxication.[30]

279.    Anne Arundel County has instituted a number of cutting edge programs aimed at curbing addiction and abuse. The Safe Stations program was introduced in April of 2017.[31] As a part of the program all police and fire stations in Anne Arundel County have been designated Safe Stations. People struggling with heroin or opioid addiction can go to the police or fire station without fear of arrest and seek help for their addiction. The County's Crisis Response System works to find treatment for anyone who shows up. The County developed new technology called an "electronic dashboard" to enable emergency personnel to quickly determine which treatment centers have available beds, instead of having to call each center individually.[32]

280.    The County has also implemented interventions aimed at preventing abuse and addiction among adolescents. Through its "Not My Child" program, the County provided education regarding the facts of prescription drug abuse and the increase of heroin use in the County. Anne Arundel County has also been stocking all schools with Naloxone, in compliance with a new state law.

281.    The proliferation of opioids and the resulting increase in use, misuse and addiction have caused other problems as well. Many patients who become addicted to opioids will lose their jobs. Some will lose their homes and their families. Some will get treatment, but fewer will

---

[30] Phil Davis, *Carfentanil Linked to 6 Deaths in 6 Weeks in Anne Arundel*, Capital Gazette, June 6, 2017.
[31] Rachel Siegel, *In a Maryland County Ravaged by Drug Addiction, Fire and Police Stations Open their Doors*, The Washington Post, September 4, 2017.
[32] Phil Davis, *Anne Arundel Sees New Record for Fatal Opioid Overdoses*, Capital Gazette, December 12, 2017.

successfully complete it; many patients will relapse, returning to opioids or some other drug. Of those who continue to take opioids, some will overdose – some fatally, some not. Others will die prematurely from related causes – falling or getting into traffic accidents due to opioid-induced somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological disease.

282.    Absent the conduct of Defendants as described herein, the public health crisis caused by opioid misuse, abuse, and addiction in Maryland, including in Anne Arundel County, would have been averted or much less severe.

## CAUSE OF ACTION

### COUNT 1
### Public Nuisance
### (Against All Defendants)

283.    The County realleges and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further alleges:

284.    Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure the property, health, safety or comfort of the public in Anne Arundel County by their provision of PBM and mail order pharmacy services in and to the residents of Anne Arundel County.

285.    Defendants' acts and omissions offend, significantly and unreasonably interfere with, and cause damage to the public rights common to all, such as the public health, public safety, public peace, and the public comfort. Defendants had control over their conduct in Anne Arundel

71

County and that conduct has had an adverse effect on the public right. The public nuisance caused by Defendants has significantly harmed the county and a considerable number of County residents.

286.    Defendants' conduct is unreasonable.

287.    Defendants' conduct is not insubstantial or fleeting. It has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety; it is ongoing, and it is producing permanent and long-lasting damage.

288.    Defendants have created and maintained a public nuisance through their ongoing conduct of facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on formularies with preferred status, declining to impose limits on their approval for use in exchange for payments and fees from manufacturers, assisting in promoting but failing to disclose the real risks and appropriate limits on the use of opioids, and failing to use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion.  Their conduct caused utilization of opioids to skyrocket, and Defendants failed to take measures to restrict their utilization even as evidence of the epidemic mounted, including in the County, flooding the County with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and its residents.

289.    Defendants knew, or should have known, that their conduct would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

290.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used and, therefore, widely misused and diverted.    Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive

marketing of opioids, and because of Defendants' special position within the closed system, without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

291.    Defendants' conduct directly and proximately caused injury to Plaintiff and its residents.

292.    The County suffered special injuries distinguishable from those suffered by the general public. The County has incurred and continues to incur substantial harms requiring investigation, monitoring, treating, policing, and remediating the opioid epidemic.

293.    The County's public nuisance claim does not include recovery related to Defendants' provision of PBM or mail order pharmacy services to any federal health programs or pursuant to any federal contract.[33]

294.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. The County has incurred expenditures for special programs over and above its ordinary public services.

295.    The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

## PRAYER FOR RELIEF

WHEREFORE, Anne Arundel County, Maryland requests the following relief:

    a. A finding that by the acts alleged herein, Defendants have created a public nuisance;

---

[33] *See supra* at ¶ 38.

73

b.  A finding that Defendants are jointly and severally liable;

c.  For an injunction permanently enjoining Defendants from engaging in the acts and practices that caused the public nuisance;

d.  For an order directing Defendants to pay for the abatement of the public nuisance;

e.  For costs, filing fees, pre and post judgment interest, and attorney's fees;

f.  For an award of compensatory damages in an amount greater than $75,000 in an amount sufficient to fairly and completely compensate the County for all damages alleged herein; and

g.  For all other and further relief to which this Court finds it is entitled.

DATED: November 17, 2023                    ANNE ARUNDEL COUNTY, MARYLAND

By: /s/ *Gregory J. Swain*
Gregory J. Swain (CPF # 9106200276)
County Attorney

/s/ *Hamilton F. Tyler*
Hamilton F. Tyler (CPF # 9012190326)
Deputy County Attorney

Anne Arundel County Office of Law
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
Phone: (410) 222-7888
Email: gregory.swain@aacounty.org
Email: htyler@aacounty.org

Linda Singer, *pro hac vice to be submitted*
Elizabeth Smith, *pro hac vice to be submitted*
401 9th Street NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9627
lsinger@motleyrice.com
esmith@motleyrice.com

*Attorneys for Anne Arundel County, Maryland*