## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **ANNE ARUNDEL COUNTY,** | * | |
| **MARYLAND,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No.: MJM-24-90** |
| **v.** | * | |
| | * | |
| **EXPRESS SCRIPTS, INC.,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Anne Arundel County (the "County") brings this action against several pharmacy benefit managers and prescription drug distributors ("Defendants"), alleging one count of public nuisance. Am. Compl. (ECF No. 55). Defendants include Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; OptumRx, Inc.; OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; CVS Health Corporation; Caremark Rx, L.L.C.; CaremarkPCS Health L.L.C.; Maryland CVS Pharmacy L.L.C.; and CVS Pharmacy, Inc. *Id.* The County's claims arise out of the ongoing opioid epidemic and Defendants' alleged role in causing and fueling that public health crisis. *See generally id.*

Currently pending are four motions: (1) OptumInsight, Inc. and OptumInsight Life Sciences, Inc.'s (collectively, "OptumInsight Entities") Motion to Dismiss (ECF No. 53); (2) Defendants' Motion to Dismiss (ECF No. 56); (3) Defendants' Motion for Certification of

1

Questions to Supreme Court of Maryland (ECF No. 76); and (4) OptumRx, Inc.'s ("OptumRx") Motion to Disqualify Motley Rice (ECF No. 84). The motions are fully briefed and ripe for disposition. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall GRANT OptumInsight Entities' Motion to Dismiss, DENY without prejudice Defendants' Motion to Dismiss, GRANT Defendants' Motion for Certification of Questions to Supreme Court of Maryland, and DENY OptumRx's Motion to Disqualify Motley Rice.

## I.    BACKGROUND

### A.  Factual Background

The County contends that Defendants caused and maintained a public nuisance by collaborating and partnering with opioid manufacturers in deceptive and dangerous marketing of opioids for financial gain, and by spurring opioid abuse by placing these drugs on formularies[1] with preferred status and without restrictions on their approval for use. Amend. Compl. ¶ 1.

Most of the Defendants are pharmacy benefit managers ("PBMs"). *Id.* ¶¶ 15–16. PBMs are "administrators hired by third-party payers (e.g., government entities, insurers, employers) to design and administer prescription drug programs." *Id.* ¶ 16. PBMs design prescription drug benefit programs and create national formularies that set the criteria and terms under which pharmaceutical drugs are reimbursed, and review and pay claims for benefits. *Id.* ¶¶ 100–01. They determine what medications are most effective for each therapeutic use, the number of pills per

---

[1] A formulary is "[a] list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits." Formulary, HealthCare.gov, available at https://www.healthcare.gov/glossary/formulary/ (last accessed on January 14, 2025).

prescription, the number of refills permitted, any pre-authorization requirements, co-payment amounts, and other criteria. *Id.* ¶¶ 98–101. A PBM's plan can determine what medications will, or will not be, available, at what quantity and dosage, and how difficult it may be for a patient to receive that medication. *Id.* ¶ 103. Thus, according to the County, PBMs wield direct, intentional control and influence over the prescribing, dispensing, reimbursement, and consumption of opioids. *Id.* ¶¶ 105–07. Each Defendant operated as PBMs in Anne Arundel County and/or dispensed prescription opioids in Anne Arundel County. *Id.* ¶¶ 26, 109–11. The County alleges that Defendants have operated behind the scenes to fuel the opioid crisis while concealing their role and claiming concern for public health. *Id.* ¶¶ 17–18. The following summary of allegations is drawn from the County's Amended Complaint (ECF No. 55). A few large PBMs, including PBM Defendants,[2] exert substantial, but opaque, influence over the prescription-drug supply chain. *Id.* ¶¶ 98–127. The PBM Defendants had access to data indicating that opioids were being diverted, misused, and abused, but failed to use that data to make meaningful efforts to prevent opioid diversion. *Id.* ¶¶ 128–66. Instead, the PBM Defendants worked directly with opioid manufacturers to boost opioid sales and aid in deceptive marketing. *Id.* ¶¶ 167–97. The PBM Defendants facilitated and encouraged the use of opioids and flooded the market through their formulary and benefit management decisions. *Id.* ¶¶ 198–235. Defendants ignored obligations they had under federal and state law in selling opioids from mail-order and retail pharmacies. *Id.* ¶¶ 248–65, 263–303. They helped create the public health crisis in Anne Arundel County by increasing the availability of opioids while concealing their conduct. *Id.* 304–31.

---

[2] PBM Defendants include Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; OptumRx, Inc.; OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; CaremarkPCS Health LLC; and Caremark, LLC.

### B. Procedural Background

On January 10, 2024, this case was removed from the Circuit Court for Anne Arundel County, Maryland to this Court. ECF No. 1. The County filed its Amended Complaint, on March 22, 2024, alleging one count of public nuisance. Am. Compl. (ECF No. 55). The same day, the OptumInsight Entities filed a Motion to Dismiss for Lack of Jurisdiction, ECF No. 53, and Defendants filed a Motion to Dismiss for Failure to State a Claim, ECF No. 56. Defendants later filed a Motion for Certification of Questions to Supreme Court of Maryland. ECF No. 76. Finally, OptumRx filed a Motion to Disqualify Motley Rice. ECF No. 84. All pending motions are fully briefed.

## II. OPTUMINSIGHT ENTITIES' MOTION TO DISMISS

### A. Standard of Review

When a party challenges the court's power to exercise personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Orbita Telecom SAC v. Juvare LLC*, 606 F. Supp. 3d 240, 247 (D. Md. 2022) (quoting *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003)). "If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits, and discovery materials, 'the plaintiff need only make a prima facie showing of personal jurisdiction.'" *Id.* (quoting *Carefirst of Md.*, 334 F.3d at 396). The Fourth Circuit has explained that jurisdictional allegations are to be construed "in the light most favorable to the plaintiff," and "the most favorable inferences" must be drawn in favor of the existence of jurisdiction. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).

Jurisdictional discovery is proper when the plaintiff has alleged sufficient facts to suggest the possible existence of personal jurisdiction. *Pandit v. Pandit*, 808 F. App'x 179, 183 (4th Cir. 2020) (citing *Carefirst of Md.*, 334 F.3d at 402–03). However, "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." *Id.* (quoting *Carefirst of Md.*, 334 F.3d at 402).

### B.  Analysis

OptumInsight Entities challenge the exercise of personal jurisdiction over them in this forum, citing the County's failure to allege any conduct by them that occurred in Maryland and failure to show that OptumInsight Entities conducted business in Maryland. *See generally* ECF No. 54. In opposition, the County argues that its allegations suffice to suggest the possibility of grounds for personal jurisdiction, and that the Court should permit jurisdictional discovery. *See generally* ECF No. 64. In reply, OptumInsight Entities argue that the County's allegations are inadequate to warrant jurisdictional discovery. *See generally* ECF No. 71. As explained below, the Court finds the County fails to make a prima facie showing of personal jurisdiction and, in its discretion, denies its request for jurisdictional discovery.

There are two types of personal jurisdiction—general and specific. *Pandit*, 808 F. App'x at 184. General personal jurisdiction requires contacts with the forum state "so 'continuous and systemic' as to render [it] essentially at home" there. *BNSF Ry. v. Tyrrell*, 581 U.S. 402, 413 (2017); *see also Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984)). "Only a select set of affiliations with a forum will expose a defendant" to general jurisdiction, such as when the forum is a corporate defendant's "place of incorporation" or "principal place of business." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021) (internal citation and

quotation omitted). On the other hand, specific jurisdiction exists only when "the contacts related to the cause of action create a 'substantial connection' with the forum state." *Pandit*, 808 F. App'x at 184 (cleaned up). "For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" *Perdue Foods*, 814 F.3d at 189 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "In other words, the plaintiff must show that the defendant 'purposefully directed' his activities at residents of the forum, and that the plaintiff's cause of action 'arises out of or relates to' those activities." *Pandit*, 808 F. App'x at 184 (citing *Burger King*, 471 U.S. at 472; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414) (cleaned up).

There is no dispute that the Court lacks general personal jurisdiction over the OptumInsight Entities because Maryland is not their place of incorporation or principal place of business, and the County offers no facts to suggest that their contacts with Maryland are continuous and systematic. *See* Am. Compl. ¶¶ 73, 74. The County seeks to establish specific personal jurisdiction the over OptumInsight Entities.

"When a federal court sits in diversity, it 'has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process.'" *Perdue Foods*, 814 F.3d at 188 (quoting *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir.1993)). "Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution." *Pandit*, 808 F. App'x at 185 (quoting *Carefirst of Md.*, 334 F.3d at 396). This does not mean that the court may dispense with either

requirement because there may be cases where the facts will fall outside the scope of the long-arm statute even if there is a constitutional basis for jurisdiction. *Id.*

### 1.    Long-Arm Statute

The County seeks to establish personal jurisdiction of the OptumInsight Entities under two specific subsections of Maryland's long-arm statute:

> A court may exercise personal jurisdiction over a person, who directly or by an agent:
>
> (1)    Transacts any business or performs any character of work or service in the State; [or]
>
>                      * * *
>
> (4)    Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State[.]

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (4).

Under subsection (b)(1), the relevant inquiry is whether the defendant conducts business in Maryland. *Advanced Datacomm Testing Corp. v. PDIO, Inc.*, Civ. No. DKC-08-3294, 2009 WL 2477559, at *6 (D. Md. Aug. 11, 2009). "The phrase 'transacting business' does not require commerce or transactions for profit; it is, however, construed narrowly and typically requires significant negotiations or intentional advertising." *Nat'l Fire & Marine Ins. Co. v. Advanced Lighting Techs. LLC*, Civ. No. JRR-22-02723, 2023 WL 6147563, at *4 (D. Md. Sept. 20, 2023) (citation omitted).

The OptumInsight Entities argue that the County has not established that its claim against them arises from business they transacted in Maryland; instead, the suit is based on services allegedly provided to drug manufacturers outside of the State. *See* ECF No. 54 at 7–11; ECF No.

71 at 5–6. None of the County's allegations referencing the OptumInsight Entities indicate that they transacted business within Maryland. The Amended Complaint states that the OptumInsight Entities, though registered to do business in Maryland, are incorporated and have their principal places of business elsewhere, ECF No. 55, ¶¶ 73, 74, and there is no mention of any activities the OptumInsight Entities carried out within Maryland, *id.* ¶¶ 78, 132, 134, 138, 187–91, 193–95. Thus, the County fails to make a prima facie showing that personal jurisdiction is proper under § 6-103(b)(1).

Under subsection (b)(4), specific personal jurisdiction is proper if the defendant caused injuries in Maryland by actions outside the State and regularly conducts business in Maryland. To meet this requirement, the defendant must engage in "a persistent course of conduct within the state." *Nat'l Fire & Marine Ins. Co.*, 2023 WL 6147563, at *6 (internal quotation and citation omitted). Showing a persistent course of conduct is "not tantamount to establishing general jurisdiction, but [requires] greater contacts than those necessary to establish jurisdiction under [§ 6-103(b)(1)]." *Id.* (internal quotation and citation omitted). Here, the Amended Complaint does not allege that the OptumInsight Entities transact business in Maryland. Again, there is no mention in the Amended Complaint of any activities that the OptumInsight Entities carried out in Maryland. *See* Am. Compl. ¶¶ 78, 132, 134, 138, 187–91, 193–95.

In sum, the County fails to make a prima facie showing that the OptumInsight Entities are within reach of Maryland's long-arm statute.

### 2.    *Due Process*

Even if the County alleged facts sufficient to satisfy the long-arm statute, the exercise of personal jurisdiction over the OptumInsight Entities would not comport with due process. The due process analysis requires consideration of "(1) the extent to which the defendant has purposefully

availed itself of the privilege of conducting activities in the state; (2) whether the [County's] claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Carefirst of Md.* 334 F.3d at 397 (internal quotations omitted). *Accord Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). The conduct alleged in the Amended Complaint does not establish that the OptumInsight Entities purposefully availed themselves of the privilege of conducting activities within Maryland, or that the County's claims arise out of those contacts. *See* Am. Compl. ¶¶ 78, 132, 134, 138, 187–91, 193–95.

### 3.    Jurisdictional Discovery

Jurisdictional discovery is proper if the County alleges sufficient facts to suggest the possibility of personal jurisdiction. *Pandit*, 808 F. App'x at 183. A court may deny jurisdictional discovery "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state . . . ." *Carefirst of Md.*, 334 F.3d at 402–03 (collecting cases). Here, jurisdictional discovery would be unjustified because the County has not alleged any facts that suggest that this Court may have specific personal jurisdiction over the OptumInsight Entities.

The claims against the OptumInsight Entities shall be dismissed for lack of personal jurisdiction.

## III.    DEFENDANTS' MOTION FOR CERTIFICATION OF QUESTIONS TO THE SUPREME COURT OF MARYLAND

### A.  Standard of Review

Under the Maryland Certification of Questions of Law Act, a federal district court may certify a question of law to the Supreme Court of Maryland. Md. Stat. Ann., Cts. & Jud. Proc.§ 12-603 (the "Certification Act"). The Certification Act provides that:

> The [Supreme Court] of this State may answer a question of law
> certified to it by a court of the United States . . . if the answer may
> be determinative of an issue in pending litigation in the certifying
> court and there is no controlling appellate decision, constitutional
> provision, or statute of this State.

*Id.* The purpose of the Certification Act is "to promote the widest possible use of the certification process in order to promote judicial economy and the proper application of [Maryland]'s law." *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 705 (2010) (quoting Uniform Certification of Questions of Law Act § 3 cmt. (1995)) (alterations in original). The decision of whether to certify a question of law "rests in the sound discretion of the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

The decision to certify depends on several considerations, "including whether certification would 'save time, energy, and resources' and 'build a cooperative judicial federalism.'" *Md. Shall Issue, Inc. v. Montgomery Cnty., Md.*, Civ. No. TDC-21-1736, 2023 WL 3276497, at *4 (D. Md. May 5, 2023) (quoting *Lehman Bros.*, 416 U.S. at 391). "Just because a question of law qualifies for certification, however, does not mean the Court must certify it." *Doe v. Chesapeake Medical Solutions, LLC*, Civ. No. SAG-19-2670, 2020 WL 917061 (D. Md. Feb. 26, 2020) (citing *Lehman Bros.*, 416 U.S. at 390–91).

**B. Analysis**

Defendants filed both a motion to dismiss this action for failure to state a claim, ECF Nos. 56 & 56-1, and a motion to certify questions to the Maryland Supreme Court regarding whether dispensing prescription drugs and administering prescription drug benefit plans can give rise to a public nuisance claim under Maryland common law, ECF Nos. 76 & 76-1. The County opposes both motions. ECF Nos. 63 & 78. As explained below, the Court will grant the motion for certification and deny the motion to dismiss without prejudice.

10

The availability of relief for the County's public nuisance claim rests on whether Maryland common law recognizes a public nuisance claim of this type, and if so, what the elements of that claim are. In their motion to dismiss, Defendants contend that Maryland courts have never recognized a claim for public nuisance based upon "the collective effects of harms suffered by individuals from the misuse of a lawful product" and that no Maryland court has found a public nuisance "in any case that did not involve property." ECF No. 56-1 at 7. In its opposition to the motion to dismiss, the County argues that Defendants' view of Maryland public nuisance is too narrow, and that the sale of a product can support a public nuisance claim under Maryland law. ECF No. 63 at 8–9, 15, 15 n.6–8. The question of whether a public nuisance claim can be brought under Maryland common in these circumstances is appropriate for certification to the Supreme Court of Maryland. An answer to this question would be determinative of an issue in the instant case, and, currently, no controlling appellate decision supplies such an answer.

The County argues that there is no need to certify a question because Maryland public nuisance law is sufficiently clear. *See* ECF No. 78 at 3–9. This Court is not persuaded. The County points to its lawsuit in the Circuit Court for Anne Arundel County against opioid manufacturers and distributors where that court denied the defendants' motions to dismiss the public nuisance claims. ECF No. 78 at 3–5; ECF Nos. 78-1 through 78-5. But the order in that case consisted of a single sentence with no analysis and does not offer this Court any guidance or suggest how a Maryland appellate court would rule. *See* ECF No. 78–5. The County also cites a case from the Circuit Court for Baltimore City, Maryland where that court upheld Baltimore City's public nuisance claim against opioid manufacturers, distributors, and pharmacies. ECF Nos. 89-1 & 89-2 (*Mayor & City Council of Baltimore City v. Purdue Pharma, L.P.*, No. 24-C-18-0515 (Md. Cir. Ct. Aug. 16, 2024)). However, during a hearing, that court expressed "serious reservations about

11

the use of public nuisance claims to address social problems of this breadth and complexity." ECF No. 89-2 at 6:11–12. The court also acknowledged "the reservations that other courts have expressed about using public nuisance in this way may be adopted by the Maryland Supreme Court." *Id.* at 7:2–8. Further, Defendants cite a decision by the Circuit Court for Baltimore City in another case granting a motion to dismiss a public nuisance claim against fossil fuel companies, stating that, in Maryland, public nuisance has been applied only to cases involving land. ECF No. 80; ECF No. 80-1 (*Mayor & City Council of Baltimore v. BP P.L.C., et al.*, No. 24-C-18-004219 (Md. Cir. Ct. July 10, 2024)) at 23. Courts have recognized a dividing line between public nuisance law and product liability law, and Maryland appellate courts have not extended public nuisance law to deceptive marketing practices. *Id.* It is clear from the foregoing decisions that the County has asserted a novel claim in an unsettled, novel area of Maryland law.

In *Mayor & City Council of Baltimore City v. Purdue Pharma*, the court stated an expectation that the case would eventually reach the Maryland Supreme Court. *Id.* at 6:9–10. Because the instant case presents similar issues, this Court finds that it would be appropriate to certify questions to the Maryland Supreme Court instead of guessing how that court may eventually rule.

Accordingly, the Court adopts Defendants' proposal to certify the following questions of law to the Supreme Court of Maryland:[3]

> 1. Under Maryland's common law, can the licensed dispensing of, or the administration of benefits plans for, a medication approved

---

[3] The Fourth Circuit recently certified a similar question to the West Virginia Supreme Court: "Under West Virginia's common law, can conditions caused by the distribution of a controlled substance constitute a public nuisance and, if so, what are the elements of such a public nuisance claim?" *City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 644 (4th Cir. 2024).

by the U.S. Food and Drug Administration give rise to a claim for public nuisance?

2. If so, what are the elements of such a public-nuisance claim, and what types of potential relief can a local government plaintiff seek when asserting such a claim?

The County shall have 14 days from the date of this Memorandum and the accompanying Order to file any objections, or to propose modifications, to the proposed questions.

## IV.    OPTUMRX'S MOTION TO DISQUALIFY MOTLEY RICE

OptumRx seeks to disqualify the County's counsel from the law firm Motley Rice LLC for violations of Maryland Attorneys' Rule of Professional Conduct 1.11(c) ("Rule 1.11(c)").[4] *See generally* ECF Nos. 84, 84-1 & 88. The County opposes the motion. *See* ECF No. 85. This is not the first time that counsel for the parties have litigated the issue of whether Motley Rice's involvement in litigation against OptumRx violates rules of professional conduct. *See In re OptumRx, Inc.*, No. 24-3396, 2024 U.S. App. LEXIS 26695 (6th Cir. Oct. 22, 2024); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2024 WL 3387288 (N.D. Ohio Mar. 18, 2024); *City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525-PBS (D. Mass. October 18, 2024) (ECF No. 92-2); *People of the State of California v. Express Scripts, Inc., et al.*, No. 23STCV20886, (Cal. Super. Ct. Nov. 14, 2024) (ECF No. 96-1). As in the foregoing cases, this Court will deny the motion.

### A.  Factual Background

Motley Rice has, in the past, worked for multiple government entities on investigations concerning OptumRx.

_____

[4] Rule 1.11(c) is codified at Md. Rule 19-301.11(c).

Motley Rice represented the City of Chicago beginning in 2018. *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at \*2. In November 2018, Chicago issued an investigative subpoena to OptumRx requesting, among other things, documents and information regarding OptumRx's practices related to copay clawbacks and OptumRx's contracts and communications with certain health insurance companies, pharmacies, and third-party payors. Hooker Decl. Ex. L (ECF No. 84-16) (Chicago Subpoena). Prior to disclosing any documents, OptumRx and Chicago negotiated a confidentiality agreement, which was executed by a Motley Rice attorney who was acting as Special Assistant Corporation Counsel for Chicago. Hooker Decl. Ex. M (ECF No. 84-17) (Chicago Conf. Agmt.). The agreement provides, in relevant part:

> All information produced or made available for inspection and copying by [OptumRx], including but not limited to information contained in documents or in correspondence between counsel, will be used solely in furtherance of the Investigation and any subsequent litigation brought by the City of Chicago against [OptumRx] that is directly related to this Investigation and will be used for no other purpose whatsoever without the prior written consent from [OptumRx] or by a court order or other applicable law.

*Id.* ¶ 3. OptumRx then produced material in response to the Chicago Subpoena, including prescription claims data. Grant Decl. (ECF No. 84-3) ¶¶ 10–12.

In December 2020, the District of Columbia Attorney General hired Motley Rice to assist with an investigation into and potential litigation against PBMs, including OptumRx. Hooker Decl. Ex. F (ECF No. 84-10) (D.C. Letter). The D.C. Attorney General issued an investigative subpoena to OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits." Hooker Decl. Ex. G (ECF No. 84-11) (D.C. Subpoena) at 1. The subpoena directed OptumRx to produce the documents to an attorney at Motley Rice. *Id.* OptumRx and Motley Rice entered into a confidentiality agreement stating that Motley Rice could not rely

14

"on Confidential Material in pursuing information or claims in any other matters outside of its representation of the [Office of Attorney General]." Hooker Decl. Ex. H (ECF No. 84-12) (D.C. Conf. Agmt.) ¶ 2. OptumRx produced information directly to Motley Rice, including over 68,000 pages of documents.

In April 2021, the Hawaii Attorney General appointed Motley Rice as Special Deputy Attorney General in connection with the department's investigation into the billing practices of certain PBMs. Hooker Decl. Ex. A (ECF No. 84-5) (Agreement for Special Deputy Attorney General Services). After Motley Rice's appointment, the Attorney General issued an investigative subpoena to OptumRx seeking documents spanning over a decade relating to various aspects of OptumRx's business. Hooker Decl. Ex. B (ECF No. 84-6) (Hawaii Subpoena). The documents included information regarding OptumRx's formulary development, rebate negotiations, finances, and contractual relationships with drug manufacturers. *Id.* The subpoena directed OptumRx to deliver the documents directly to an attorney at Motley Rice. *Id.* at 1. OptumRx and Hawaii entered into a confidentiality agreement in which Hawaii agreed that Motley Rice could not rely "on Confidential Material in pursuing information or claims in any other matters outside of its representation of the State." Hooker Decl. Ex. C (ECF No. 84-7) (Haw. Conf. Agmt.) ¶ 2. OptumRx produced the same 68,000 pages of unredacted documents produced in the D.C. investigation regarding OptumRx's business operations. Hooker Decl. (ECF No. 84-4) ¶¶ 7–9; Hooker Decl. Ex. D, E (ECF Nos. 84-8, 84-5) (Production Letters); Caplis Decl. (ECF No. 84-2) ¶ 9.

The multi-district opioid litigation ("MDL") is "one of the most complicated collections of cases in history." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *11 (citing Sara Randazzo, *Opioid-Addiction Litigation Heads to Complex Trial*, Wall Street Journal (Oct. 20,

2019)). Litigation has been ongoing for over six years. To promote coordination among the cases, the MDL court placed a standing obligation on the defendants to produce documents and other discovery into the MDL discovery repository. *Id.* Consistent with that standing obligation, OptumRx was required to produce the documents that it had previously produced in response to the Chicago, D.C., and Hawaii subpoenas and place those documents in the MDL discovery repository. *Id.* at *11–14, *see also* ECF No. 85-2 (Letter from OptumRx's Counsel) (OptumRx produced all the information Motley Rice obtained during its work as a public officer by March 26, 2024); ECF No. 85-3 (Acknowledgment and Agreement of Hamilton Tyler, Deputy County Attorney). OptumRx has complied with that production requirement, *see* ECF No. 85-2, giving all attorneys with access to the MDL discovery repository access to those documents.

### B. Standard of Review

Disqualification of counsel is "a drastic remedy" because "it deprives litigants of their right to freely choose their own counsel." *Gross v. SES Americom, Inc.*, 307 F. Supp. 2d 719, 722 (D. Md. 2004). "Disqualification at the urging of opposing counsel is permitted only where the conflict is such as clearly to call in question the fair and efficient administration of justice." *Id.* (cleaned up).

In assessing a motion to disqualify, "the court must strike a 'balance between the client's free choice of counsel and the maintenance of the highest and professional standards of the legal community.'" *Warn v. Sears*, Civ. No. PJM-23-2466, 2024 WL 3046644, at *3 (D. Md. June 18, 2024) (quoting *Buckley v. Airshield Corp.*, 908 F. Supp. 299, 304 (D. Md. 1995)). Therefore, "the moving party bears a high standard of proof to show that disqualification is warranted." *Id.* (cleaned up).

## C.  Analysis

OptumRx argues that Motley Rice counsel is disqualified from representing the County in the instant matter because Motley Rice's representation of the County violates Rule 1.11(c). *See* ECF Nos. 84 & 84-1 at 9–17. The County argues that Motley Rice's representation does not violate Rule 1.11(c). *See generally* ECF No. 85.

Rule 1.11(c) reads:

> Except as law may otherwise expressly permit, an attorney having information that the attorney knows is confidential government information about a person acquired when the attorney was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public. A firm with which that attorney is associated may undertake or continue representation in the matter only if the disqualified attorney is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

Md. Rule 19-301-11(c).

Put plainly, four elements must be established for a Rule 1.11(c) violation: (1) the lawyer used to be a public official or employee; (2) during that public employment, the lawyer acquired confidential government information; (3) the lawyer is now representing a client whose interests are adverse to the person that the confidential government information concerns; and (4) the confidential government information can be used to the material disadvantage of that person in the current representation. *Id.*

This Court agrees with the MDL court's finding that Motley Rice worked as a public officer when it obtained alleged confidential information about OptumRx because Motley Rice attorneys

exercised government powers. *See In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at

*7. As stated by that court:

> The unavoidable fact is that, when Motley Rice served government subpoenas and received documents in response—even if it was acting on behalf of those governmental entities under a contingent fee, independent contractor agreement—it had been granted authority to wield the power of the government. In that way, Motley Rice was acting as a public officer. Whether Motley Rice was technically a public officer or employee, under the strict legal definition used by the hiring governmental entity or the terms of its contract, cannot alter the reality that Motley Rice gained access to information pursuant to governmental authority.

*Id.*

Further, the court found that the governmental clients Motley Rice represented in the MDL

proceeding were "private clients" for purposes of Ohio's Rule 1.11(c). The court cited ABA

Formal Opinion 509, which interpreted Model Rule of Professional Conduct 1.11 to forbid "a

lawyer who served as a public officer or employee" from representing "*any client*" not entitled to

use "confidential government information" the lawyer obtained "about a person while working for

the government[.]" *Id.* at *8 (quoting ABA Comm. on Ethics & Pro. Resp., Formal Op. 509 (2024)

("ABA Formal Op. 509"). Although the MDL court found Motley Rice to have served as a "public

officer or employee" and its MDL clients as "private clients" for purposes of Ohio's Rule 1.11(c),

the court found that OptumRx failed to show that Motley Rice obtained "confidential government

information" for the rule's purposes. *Id.* at *11.

Rule 1.11(c) defines "confidential government information" as "information that has been

obtained under governmental authority and which, at the time this Rule is applied, the government

is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which

is not otherwise available to the public." Rule 1.11(c). ABA Formal Opinion 509 provides some

guidance on what information is "not otherwise available to the public." *Id.*; *see* ABA Formal Op. 509. To start, "Rule 1.11(c) does not apply to all information obtained under government authority[.]" ABA Formal Op. 509 at 4. Rather, "[w]hether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact." *Id.* The MDL court found that OptumRx did not meet its burden of proof on this question. *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *9–11. The court rejected OptumRx's experts' position that information OptumRx disclosed in the prior government investigations could not be obtained in "routine discovery," noting the availability of protective measures under Rule 26(c) of the Federal Rules of Civil Procedure. *Id.* OptumRx relies upon the same experts in the instant case. *See* Hooker Decl. Ex. P (ECF No. 84-20) (Montgomery-Muchman Expert Report).

Here, the Court declines to reach the question of whether Motley Rice obtained "confidential government information" for Rule 1.11(c) purposes in its prior work as a public officer because OptumRx fails to identify a material disadvantage it faces if Motley Rice continues its representation of the County. *In re OptumRx, Inc.*, No. 24-3396, 2024 U.S. App. LEXIS 26695, at *3–4 (6th Cir. Oct. 22, 2024). All of the information that Motley Rice obtained from OptumRX during the Chicago, D.C., and Hawaii investigations has been placed into the MDL discovery repository. *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *13–15. Here, the County's non-Motley Rice attorneys, just like its Motley Rice counsel, have access to the documents in the MDL discovery repository. *See* ECF No. 85-3. OptumRx fails to show that it faces any greater disadvantage from the involvement of the County's Motley Rice counsel than it does from its non-Motley Rice attorneys. The Court is not persuaded by OptumRx's contention that Motley Rice must be disqualified because it had a longer period of access to the information at issue than the County's other attorneys. At this point, all counsel has had access to the MDL

discovery repository for almost a full year. *See* ECF No. 85-2. The mere fact that Motley Rice may have had access to the documents for longer does not rise to the level of material disadvantage. *See id.* at *14–15; *City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525-PBS (D. Mass. October 18, 2024) (ECF No. 92-2); *People of the State of California v. Express Scripts, Inc., et al.*, No. 23STCV20886, (Cal. Super. Ct. Nov. 14, 2024) (ECF No. 96-1 at 8–9).

Because OptumRx has failed show the possibility of a material disadvantage from Motley Rice's representation of the County, its motion to disqualify the firm will be denied.

## V.    CONCLUSION

For the reasons stated herein, the OptumInsight Entities' Motion to Dismiss (ECF No. 53) and Defendants' Motion for Certification of Questions to the Supreme Court of Maryland (ECF No. 76) will be GRANTED. The Court shall certify questions of law to Maryland Supreme Court. This matter will be stayed pending a decision from the Maryland Supreme Court regarding the certified questions. Defendants' Motion to Dismiss (ECF No. 56) will be DENIED without prejudice to renewal at an appropriate time after the stay is lifted. OptumRx's Motion to Disqualify Counsel (ECF No. 84) will be DENIED.

A separate Order will follow.


    1/21/25                                                  /S/
Date                                           Matthew J. Maddox
                                               United States District Judge


20